**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

_____

In re: SHAWE & ELTING LLC ) C.A. No. 9661-CB
)
_____ )
)
PHILIP R. SHAWE, derivatively on behalf of )
TRANSPERFECT GLOBAL, INC., and in his )
individual capacity, )
)
   Plaintiff, )
)
  v. )
) C.A. No. 9686-CB
 ELIZABETH ELTING, )
)
   Defendant, )
)
  and )
)
TRANSPERFECT GLOBAL, INC., )
)
   Nominal Party. )
_____ )
)
In re: TRANSPERFECT GLOBAL, INC. )
) C.A. No. 9700-CB
_____ )
)
ELIZABETH ELTING, )
)
   Petitioner, )
)
  v. ) C.A. No. 10449-CB
)
PHILIP R. SHAWE and SHIRLEY SHAWE, )
)
   Respondents, )
)
  and )
)
TRANSPERFECT GLOBAL, INC., )
)
   Nominal Party. )
_____ )

# MEMORANDUM OPINION

Date Submitted:  April 27, 2016
Date Decided:  July 20, 2016

Kevin R. Shannon, Berton W. Ashman, Jr., Christopher N. Kelly, Jaclyn C. Levy and Matthew A. Golden, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Kurt M. Heyman and Melissa N. Donimirsky, PROCTOR HEYMAN ENERIO LLP, Wilmington, Delaware; Philip S. Kaufman, Ronald S. Greenberg, Marjorie E. Sheldon and Jared I. Heller, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York; Robert A. Atkins, Eric Alan Stone and Gerard E. Harper, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Attorneys for Elizabeth Elting.*

Gregory P. Williams, Lisa A. Schmidt, Robert L. Burns and J. Scott Pritchard, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; Peter B. Ladig and Brett M. McCartney, MORRIS JAMES LLP, Wilmington, Delaware; Paul D. Brown, CHIPMAN BROWN CICERO & COLE LLP, Wilmington, Delaware; David L. Finger, FINGER & SLANINA LLC, Wilmington, Delaware; David B. Goldstein, RABINOWITZ, BOUDIN, STANDARD, KRINSKY & LIEBERMAN, P.C., New York, New York; Philip L. Graham, Jr. and Penny Shane, SULLIVAN & CROMWELL LLP, New York, New York; Howard J. Kaplan and Joseph A. Matteo, KAPLAN RICE LLP, New York, New York; Ronald C. Minkoff and Andrew Ungberg, FRANKFURT KURNIT KLEIN & SELZ, P.C., New York, New York; *Attorneys for Philip R. Shawe.*

Robert A. Penza, R. Montgomery Donaldson and Christopher Coggins, POLSINELLI PC, Wilmington, Delaware; Jay S. Auslander, Natalie Shkolnik and Julie Cilia of WILK AUSLANDER LLP, New York, New York; *Attorneys for Shirley Shawe.*

Jennifer C. Voss, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Attorney for Custodian Robert B. Pincus.*

**BOUCHARD, C.**

Elizabeth Elting and Philip Shawe are the co-founders and co-CEOs of TransPerfect Global, Inc. ("TPG" or the "Company"). As chronicled in a post-trial decision issued last year, their management of the corporation devolved into a state of dysfunction. Emblematic of the deep divisions and fundamental distrust between them, virtually every aspect of this litigation has been turbulent, with each side filing motions for sanctions against the other. This decision resolves the sanctions motion Elting filed against Shawe based on an evidentiary hearing that was held earlier this year.

As explained below, clear evidence adduced at the sanctions hearing establishes that Shawe acted in bad faith and vexatiously during the course of the litigation in three respects: (1) by intentionally seeking to destroy information on his laptop computer after the Court had entered an order requiring him to provide the laptop for forensic discovery; (2) by, at a minimum, recklessly failing to take reasonable measures to safeguard evidence on his phone, which he regularly used to exchange text messages with employees and which was another important source of discovery; and (3) by repeatedly lying under oath—in interrogatory responses, at deposition, at trial, and in a post-trial affidavit—to cover up aspects of his secret deletion of information from his laptop computer and extraction of information from the hard drive of Elting's computer.

1

Shawe's actions obstructed discovery, concealed the truth, and impeded the administration of justice. He needlessly complicated and protracted these proceedings to Elting's prejudice, all while wasting scarce resources of the Court. Accordingly, Elting's motion for sanctions is granted. Shawe will be required to pay a significant portion of her attorneys' fees and expenses, as explained below.

## I.    BACKGROUND

These are the facts as I find them based on the documentary evidence and witness testimony provided during a two-day hearing held on January 7-8, 2016 (the "Sanctions Hearing"). Five fact witnesses and two expert witnesses testified. The two experts provided testimony concerning Shawe's deletion of files from his laptop computer after he had been ordered to provide the laptop for forensic discovery. Elting's expert was Daniel Schilo of Deloitte Financial Advisory Services LLP ("Deloitte"). Shawe's expert was Michael Bandemer of Berkeley Research Group. I accord the evidence the weight and credibility I find it deserves.

For additional background on the disputes between Shawe and Elting in their management of the Company, the reader is referred to the post-trial opinion issued on August 13, 2015 (the "Merits Opinion"),[1] after a six-day trial (the "Merits Trial"). The facts relevant here begin in late 2013.

---

[1] *In re Shawe & Elting LLC*, 2015 WL 4874733 (Del. Ch. Aug. 13, 2015).

## A. Shawe Obtains Access to Elting's Gmails with Wudke's Help

In October 2013, Elting hired Kramer Levin Naftalis & Frankel LLP to try to negotiate a resolution of the increasingly acrimonious disputes that had been brewing between Shawe and Elting for some time over their management of the Company. This enraged Shawe. Rather than hire his own counsel and engage in a mature dialogue, Shawe undertook a campaign to spy on Elting in pursuit of what had become a personal battle in which Shawe was determined to get his way over Elting at all costs, even if (to use Shawe's words) it meant "shutting down" or "dismantling" the Company.[2]

Shawe initially directed employees to intercept Elting's regular mail, including her correspondence with Kramer Levin, and to monitor her phone calls. By the end of December 2013, Shawe's surreptitious monitoring of Elting had expanded to include her private emails, including those with her counsel.

---

[2] *See id*. at *5 (quoting Shawe's emails). On April 11, 2016, Shawe moved to supplement the Sanctions Hearing record to include evidence that Elting reimbursed the Company in December 2015 for approximately $159,000 that the Company paid two years earlier to Kramer Levin and Kidron Corporate Advisors LLC, a financial advisor Kramer Levin had hired. Mot. to Supplement the Record to Include Post-Hearing Evidence (April 11, 2016). In that motion, Shawe claims that "the event that finally pushed Shawe to go into Elting's office was discovering that Elting was using TransPerfect funds to pay her lawyers." *Id.* ¶ 4. I rejected this asserted justification in the Merits Opinion and see no basis to revisit it now. Merits Opinion, 2015 WL 4874733, at *27 n.288). In any event, the supplemental evidence is irrelevant to the matters at issue here, namely, Shawe's intentional deletion of files from his laptop, his reckless failure to safeguard evidence on his phone, and his repeated, intentionally false statements under oath in connection with the Merits Trial.

3

Late on New Year's Eve, 2013, Shawe used a master cardkey to access her office. Shawe removed her computer and carried it to his office, where Michael Wudke, President of TPG's Forensic Technology business, was waiting.[3] Shawe directed Wudke to make an image of Elting's hard drive.[4] Wudke did so by removing the hard drive and connecting it to a forensic "Tableau device" with a "write blocker," which ensured that no trace of his actions would be left on Elting's computer.[5] Wudke then restored the hard drive to Elting's computer, which Shawe returned to her office.[6] Shawe did not tell Wudke whose computer it was, and he directed Wudke not to document the copying.[7]

On January 1 or 2, 2014, Shawe ordered Wudke to search for emails on the image Wudke had made of Elting's hard drive. Wudke exported the Outlook ".pst" and ".ost" files (which archive emails) onto an external device.[8] Wudke saw that one of the files was named "lizelting1@gmail.com.pst.," from which he

---

[3] Transcript of Sanctions Hearing ("Tr.") 347 (Wudke) (Jan. 7-8, 2016); Tr. 484-85 (Shawe).

[4] Tr. 347-48 (Wudke).

[5] Tr. 358-59 (Wudke).

[6] Tr. 359-60 (Wudke).

[7] Tr. 360-62 (Wudke).

[8] Tr. 352-54, 364-65 (Wudke).

4

deduced that the hard drive was Elting's.[9] Wudke gave the external device containing Elting's emails to Shawe.[10]

Wudke helped Shawe download Elting's Gmails on at least two other occasions in early 2014. Each time, also late at night, Shawe took Elting's computer from her office, brought it to Wudke's office, and had Wudke extract Elting's emails from her hard drive while instructing him not to document his actions.[11]

During the first quarter of 2014, Wudke installed "NUIX" onto Shawe's laptop.[12] NUIX is a forensic tool that allows a user to search information from unstructured data.[13] Wudke taught Shawe how to enter search terms into NUIX to find responsive emails, and entered NUIX searches that Shawe requested.[14]

As discussed below, Shawe repeatedly provided false testimony during the litigation to conceal Wudke's involvement in the extraction of Gmails from the hard drive of Elting's computer as well as other activities involving the deletion of

---

[9] Tr. 363-64 (Wudke).

[10] Tr. 354 (Wudke).

[11] Tr. 355-56, 365-68 (Wudke).

[12] Tr. 78 (Schilo); Tr. 385-88 (Wudke).

[13] Tr. 385-86 (Wudke).

[14] Tr. 386-88 (Wudke).

files from Shawe's laptop. Wudke's role did not become known until late November 2015, shortly before the Sanctions Hearing.

## B.    Shawe Remotely Accesses Elting's Privileged Communications

Beginning on March 31, 2014, Shawe arranged to access Elting's hard drive on her office computer remotely.[15] Having obtained her unique identification number from the back of her office computer, he mapped his way to her hard drive.[16] Event logs from Elting's and Shawe's work computers show that Shawe used this method to access Elting's computer at least 44 times on 29 different dates between March and July 2014.[17] These events occurred late in the evening or in the early hours of the morning.[18] Through his stealthy actions, Shawe ultimately gained access to approximately 19,000 of Elting's Gmails, including approximately 12,000 privileged communications with her counsel at Kramer Levin and her Delaware counsel in this litigation.[19]

---

[15] Merits Opinion, 2015 WL 4874733, at *13.

[16] *Id.*; *see* JX-S 16 ¶¶14-15; Tr. 539 (Shawe); Shawe Dep. 226 (Dec. 23, 2015).

[17] JX-S 16 ¶¶12-16 & App'x A.

[18] *Id.*

[19] Merits Opinion, 2015 WL 4874733, at *13.

6

## C.    Shawe Hires Nathan Richards, Who Assists in Spying on Elting

On April 1, 2014, Nathan Richards, a former TPG employee who worked for Shawe, came to New York at Shawe's request to meet with him.[20]  Richards believed he was coming for a marketing assignment.[21]  Just five days later, on April 6, Richards used a temporary card key to enter Elting's office at 4:47 a.m.[22] Richards took photographs of Elting's office, including the inside of her file cabinets, and removed hard copies of documents, which Richards delivered to an investigator working for Shawe's lawyers at Sullivan & Cromwell LLP.[23]

In May 2014, Shawe entered into a "Consulting Agreement" with Richards that provided for Richards to perform "paralegal and litigation support services" and to "facilitate the rendering of legal services" by Shawe's counsel "in connection with disputes between or among" Shawe, Elting and related parties.[24] The Agreement was back-dated to "as of April 4, 2014," before Richards entered Elting's office on April 6.[25]

---

[20] Tr. 399-403, 436 (Richards).

[21] Tr. 436 (Richards).

[22] Tr. 412, 440-41 (Richards); JX 1348 at 7.

[23] Tr. 444, 447-48 (Richards); JX-S 35 at 36-38, 41.

[24] JX-S 3 at 1.

[25] *Id.*; Tr. 402, 437-38 (Richards).

Richards had no experience as a paralegal or in litigation support, investigative work, or "document preservation"— a task Shawe later would stress was one of Richard's key functions.[26] Richards had worked at TransPerfect in communications and marketing, later at a not-for-profit, and then formed his own company offering marketing services.[27] The "Consulting Agreement" promised Richards $30,000 a month, and eventually yielded him $250,000 for approximately ten months of work—almost twice the highest salary Richards had ever earned before.[28]

On later occasions, all early in the morning and all at Shawe's direction, Richards entered Elting's office and that of TPG employee Gale Boodram to go through and photograph their files.[29] Richards described his procedure for taking the photographs as a technique he had learned from television crime shows.[30] Richards deployed these methods because Shawe told him that they were engaged

---

[26] Tr. 405, 434-35, 443 (Richards); Tr. 491-92 (Shawe).

[27] Tr. 398-402 (Richards).

[28] Tr. 436-39 (Richards); JX-S 3 at 1.

[29] Tr. 441-46 (Richards).

[30] Tr. 416 (Richards).

in a "fraud investigation" involving, among other things, forgery.[31] As Richards later acknowledged, that suspicion proved baseless.[32]

### D. The Litigation Hold Notices

In May 2014, Shawe and Elting filed four separate lawsuits against each other, one in New York and three in this Court. Anticipating the onset of litigation, Shawe distributed a "Litigation Hold Notice" to senior management and other employees of TPG on April 11, 2014.[33] The notice applied to both text messages and data on laptop computers.[34] Shawe instructed that recipients were "to retain and not destroy any documents or communications, either in hard copy or electronic form, relating in any way, either directly or indirectly, to Shawe & Elting LLC. If you are uncertain as to whether a particular document related to this matter, it should be retained."[35]

On September 3, 2014, as the Delaware litigation was heating up, Elting served Shawe with document requests seeking Shawe's text messages, communications from Shawe's personal email addresses, and documents

---

[31] Tr. 412-14 (Richards); Tr. 477-78 (Shawe).

[32] Tr. 442 (Richards).

[33] JX-S 5 at 5-6.

[34] *See* Tr. 596 (Shawe).

[35] JX-S 5 at 5. The entity referred to in this litigation hold notice, Shawe & Elting LLC, served as a vehicle to receive money from TPG and to make distributions periodically to Shawe and Elting. Merits Opinion, 2015 WL 4874733, at *2.

9

concerning Richards.[36] That same day, Elting sent out her own litigation hold notice to TPG senior management and other employees.[37] Similar to the one Shawe issued in April, it called for the preservation of documents, including emails and text messages, on personal phones and laptops. Elting instructed that, "[b]ecause of the number of issues in dispute, you must retain and may not destroy any documents or communications, whether in hard copy or electronic form, and including those stored on personal computers or handheld electronic devices, that relate in any way to TransPerfect, your employment here, or to me or Phil."[38] Shawe replied to the email, stating that "Liz is absolutely correct" and that everyone must "save all documents that might be relevant."[39]

Despite these two litigation hold notices (the "Litigation Hold Notices") and his familiarity with litigation discovery practices as the co-CEO of a company engaged in providing litigation support services, Shawe did nothing to image or preserve his iPhone or laptop, both of which he continued to use.[40] Nor did Shawe, or anyone else, tell Richards that the Litigation Hold Notices applied to Richards' own documents, including his communications with Shawe, even though Richards

---

[36] JX-S 4 at 21.

[37] JX-S 5 at 3-4.

[38] *Id.* at 4.

[39] *Id.* at 3.

[40] Tr. 596-600, 603-04 (Shawe).

10

was (according to Shawe) working directly for Shawe on "litigation support services" and his key task was "document preservation."[41]

### E. The September 26 Conference and Scheduling of Trial

On September 26, 2014, the Court held a conference at which it granted Elting leave to retain a vendor to collect the Company's electronically stored information.[42] The parties ultimately agreed to use Deloitte for this purpose. Concerned that the manifest tensions between the parties presaged that discovery would be highly contentious, I cautioned the parties about the dangers of spoliating evidence:

> [T]he last thing anybody should want to have happen here – and I'm not suggesting anybody would, but the last thing you want to allow any of your clients to be in the position or exposed to having happen is some ESI or other discovery gone missing. That will be a horrible outcome for whoever is found responsible for that, if that were ever to occur. And the sanctions, you know, can range from financial in nature to adverse inferences to losing the case[.][43]

On November 18, 2014, at the conclusion of a hearing during which the deep divisions between Shawe and Elting again were apparent, I ordered that the

---

[41] Tr. 492 (Shawe); JX-S 3 at 1; JX-S 5.

[42] Tr. of Teleconference at 5 (Sept. 26, 2014).

[43] *Id.* at 7-8.

11

three then-pending cases be scheduled for an expedited trial on a consolidated basis.[44]  Trial was later scheduled to begin on February 23, 2015.

### F.  Shawe's iPhone is Damaged and Discarded

On Saturday, November 22, 2014, just four days after the Court ordered an expedited trial, Shawe's iPhone allegedly was damaged when Shawe visited his brother Larry at his apartment.[45]  I say "allegedly" because, as discussed below, the phone ended up being discarded in a strange episode and was never made available for a forensic examination.

At some point during Shawe's visit, the brothers went into the kitchen, leaving Shawe's phone in the adjacent living room with Larry's five year-old daughter, Ava.[46]  Hearing Ava scream, the brothers ran into the living room to find Shawe's iPhone partly submerged in a plastic cup of Diet Coke.[47]  The partial submersion, which Larry characterized as a "1 out of 100,000" shot, lasted just a

---

[44] *See In re TransPerfect Global, Inc.*, 2014 WL 6810761, at \*1-3 (Del. Ch. Dec. 3, 2014) (denying motion for the appointment of a temporary custodian but noting that Elting had "identified a number of areas of fundamental disagreement between her and Shawe that may well support a finding of deadlock and warrant the appointment of a custodian under 8 Del. C. § 226(a)(2) after the trial of this action is held and the Court has the opportunity to consider a full record.").

[45] Tr. 281-82 (Larry Shawe); Tr. 496 (Shawe).

[46] Tr. 283 (Larry Shawe).

[47] Tr. 283, 285, 287 (Larry Shawe).

couple of seconds.[48] Shawe retrieved the phone, dried it, charged it, and tried "several techniques with the buttons" to revive it, without success.[49]

The next week, before Thanksgiving, Shawe gave the phone to his "trusted assistant" Joe Campbell, with whom Shawe shared the same office, and instructed Campbell to attempt to revive the phone.[50] Shawe did not say anything to Campbell about the outstanding discovery requests or remind him about the Litigation Hold Notices.[51]

After taking possession of the phone, Campbell tried to recharge it and unsuccessfully searched Google for solutions.[52] He did not contact Apple or visit the Apple Store eight blocks from his office,[53] nor did he solicit aid from TPG's forensics team.[54] After making some modest efforts to revive the phone, Campbell said he put the phone in the drawer of his office desk.[55] The story of what allegedly happened with the phone next is bizarre.

---

[48] Tr. 286-87 (Larry Shawe).

[49] Tr. 497, 589-90 (Shawe).

[50] Tr. 308 (Campbell); Tr. 497-98, 597 (Shawe).

[51] Tr. 312 (Campbell).

[52] Tr. 310 (Campbell).

[53] Tr. 311 (Campbell).

[54] *Id.*

[55] Tr. 293 (Campbell).

According to Campbell, sometime in December 2014, he opened his desk drawer where he had left Shawe's iPhone and concluded from seeing "some droppings" in the drawer that a rat had invaded the desk—which was located on the 39th floor of a commercial office building at 3 Park Avenue—and chewed on a PowerBar.[56] Campbell claims that, in a "visceral" reaction, he tossed the contents of the drawer, including the iPhone, into the garbage.[57] Campbell had been a paralegal for five years and was a recipient of both Litigation Hold Notices.[58] His claim that he threw out the phone because of rat droppings is inexplicable.

### G. The December 11 Expedited Discovery Order

On December 2, 2014, Elting moved for expedited discovery in aid of a motion for sanctions she later filed (the "Sanctions Motion") based on her discovery, on November 25, 2014, that Shawe had accessed and reviewed her personal Gmails, including emails with her counsel. On December 11, I entered an order granting this motion (the "Expedited Discovery Order"), finding that expediting discovery was "urgently necessary to protect Elting's rights and the integrity of these proceedings and related actions."[59]

---

[56] Tr. 294-95, 313-14 (Campbell).

[57] Tr. 294, 296 307, 314 (Campbell).

[58] Tr. 307 (Campbell); JX 5; *see also* Tr. 330 (Campbell) (admitting he would not have thrown out the phone if he had recalled the Litigation Hold Notices).

[59] JX-S 6 at 2.

14

The Expedited Discovery Order granted discovery on an expedited basis into "[t]he full extent of, and reasons for, Shawe's attempt to access Elting's Gmail," including the "identity and role of all persons who assisted Shawe in such conduct and who were aware (or should have been aware) of such conduct (and when)."[60] It directed Shawe to respond to Elting's interrogatories and document requests, and permitted Elting to depose "Shawe and other individuals who either assisted Shawe in accessing Elting's Gmail . . . or individuals who were otherwise involved or knew of Shawe's conduct."[61] The Expedited Discovery Order also permitted Elting to take forensic discovery of Shawe's "computers, telephones, and any other devices or systems that may contain information relevant to the issues presented in the Expedited Discovery Motion."[62]

Campbell could not recall with specificity when he discarded the phone.[63] It is thus not clear whether it was discarded before or after the Expedited Discovery Order was entered. But Campbell estimated that Shawe did not ask him about the

---

[60] *Id.* at 2-3.

[61] *Id.* at 3-4.

[62] *Id.* at 4.

[63] *See* Tr. 314 (Campbell).

status of the iPhone until January 2015, at which point Campbell told Shawe he had thrown the phone out.[64]

## H.  Shawe Deletes Files from His Laptop Before it is Imaged

After the Expedited Discovery Order was entered, Shawe continued to use his laptop for nine days,[65] until an image of the laptop was made on December 20 (the "December 20 Image"). Crucial to the pending motion, Shawe deleted approximately 19,000 files from the laptop on December 19, the day before the December 20 Image was made.[66] The deletions on December 19 took three forms.

First, Shawe added files to, and then emptied, the recycle bin on his computer.[67] The recycle bin is where users send files they wish to delete, but the files sent there generally are not actually deleted unless the bin is emptied, in which case the space on the hard drive once dedicated to the data is no longer protected and may be overwritten.[68] Shawe was not a regular emptier of his recycle bin. Forensic evidence shows that files dating back to August 2014 were

---

[64] Tr. 292-94 (Campbell).

[65] Noting that Shawe's hard drive was over 95% full on December 11 when the Expedited Discovery Order was entered, Elting argues that Shawe's continued use of the laptop "likely caused data in unallocated space of the hard drive to be overwritten" so as to spoliate evidence. Elting Op. Br. 20-21. I have considered the cited testimony carefully but the record is too inconclusive for me to make any finding on this issue.

[66] Tr. 553-54 (Shawe); JX-S 10 at 4.

[67] Tr. 65-67 (Schilo).

[68] Tr. 58-59 (Schilo).

16

still in his recycle bin on December 19.[69] On the evening of December 19, Shawe added several thousand more files to his recycle bin and then emptied it.[70]

Second, Shawe cleared his temporary internet files, which included the histories of three different internet browsers Shawe used dating back to August 2013 (Explorer and Firefox) and January 2014 (Chrome).[71] Browser histories can be an important source for forensic examination because, for example, temporary internet files can disclose email searches and identify files the user considered important enough to open.[72]

Third, Shawe deleted temporary files created by application software, which included evidence of his use of NUIX to review Elting's Gmails.[73]

Shawe's own expert, Bandemer, testified that a total of 18,970 files were deleted from Shawe's laptop on December 19.[74] As discussed below, Shawe testified at the Merits Trial that he did not delete any files from his laptop before the December 20 Image was made.[75] That testimony was plainly false.

---

[69] Tr. 66 (Schilo).

[70] Tr. 66-67 (Schilo).

[71] Tr. 235 (Bandemer).

[72] Tr. 68-72 (Schilo).

[73] Tr. 79-80 (Schilo).

[74] Tr. 232-33 (Bandemer).

[75] Tr. 620-21 (Shawe) (quoting Trial Tr. 875 (Feb. 25, 2015)).

A significant part of the Sanctions Hearing focused on the ability of the forensic experts to recover information Shawe deleted from his laptop before it was imaged on December 20 using a "volume shadow copy" of the computer's hard drive that the Windows operating system automatically generates periodically. A volume shadow copy constitutes a "snapshot" of the hard drive that "freezes all the files at that date" so that one can "roll back to the files that existed as of those dates."[76] The December 20 Image contained volume shadow copies that were generated on December 8, 12, 16, and at 12:06 p.m. on December 19. Bandemer testified that he was able to recover most of the files Shawe deleted from his laptop using the December 19 volume shadow copy.[77] Despite these efforts, as Bandemer admitted, and as Elting's expert (Schilo) agreed, 1,068 out of the 18,970 files that Shawe had deleted from his laptop were unrecoverable.[78]

## I.     The December 20 Image and Richards' Departure

On December 20, nine days after entry of the Expedited Discovery Order, Wudke made an image of Shawe's laptop using a forensics program called

---

[76] Tr. 59-62 (Schilo); *see also* Tr. 220, 234 (Bandemer).

[77] Tr. 222 (Bandemer).

[78] Tr. 233, 243, 260 (Bandemer). The unrecoverable files consisted of those that were created after the volume shadow copy was created around noon on December 19 and deleted before the December 20 Image was made. Tr. 233, 260 (Bandemer).

EnCase.[79]  Even though EnCase permits the user to identify the image-maker, Wudke omitted that information in creating the December 20 Image.[80]  At Shawe's request, Wudke did not document his work, as he normally would do for a client when imaging a hard drive.[81]

Also on December 20, Richards left for Europe.[82]  Before doing so, he deleted all of his text messages.[83]  Richards testified that no one told him to preserve his text messages and that he would not have deleted them had he been so instructed.[84]

### J.  Shawe Deletes More Files on his Laptop on December 22

On December 22, 2014, Shawe again deleted significant amounts of information from his laptop computer.  Specifically, Shawe sat with Wudke in front of his laptop and identified approximately 22,000 files that he wanted Wudke to delete.[85]  Wudke deleted the files Shawe selected using a program called CCleaner, which Bandemer, Shawe's forensic expert described as "a specialty

---

[79] Tr. 340-41 (Wudke).

[80] Tr. 53 (Schilo).

[81] Tr. 375-77 (Wudke).

[82] Tr. 457 (Richards).

[83] Tr. 458 (Richards).

[84] Tr. 458-59 (Richards).

[85] Tr. 32 (Schilo); Tr. 343-44, 378-81 (Wudke).

software program designed for the purpose of deletion, with the result that files and information would be permanently erased from the computer."[86] Wudke used CCleaner's "secure" mode, which makes recovery of files "really hard" even for a forensic examiner.[87] As a certified fraud examiner, Wudke is bound by an ethics code, which requires members to "comply with the lawful orders of the courts."[88] But Shawe did not tell Wudke about the Expedited Discovery Order.[89]

The files Shawe instructed Wudke to delete on December 22 included Elting's privileged Gmails with her lawyers on a range of topics,[90] and files that were personal to Elting and relevant to the Merits Trial.[91] The subject matter of

---

[86] Tr. 344 (Wudke); JX-S 29 ¶ 22.

[87] Tr. 33 (Schilo), 344 (Wudke).

[88] Tr. 394-95 (Wudke); JX-S 46.

[89] Tr. 382 (Wudke).

[90] JX-S 23 ¶ 23.

[91] Files personal to Elting included her personal banking statements, Kramer Levin's detailed invoices, a confidentiality agreement between Elting and an investment bank, recommendations to Elting about money managers, and an email about Elting's personal credit line. Files relevant to the Merits Trial included a statement by a TransPerfect employee alleging supposed harassment by Elting, communications about Shawe & Elting LLC, emails reflecting Shawe's monitoring of the interactions of the Company's Chief Information Officer (Yu-Kai Ng) with Deloitte on document production, emails concerning Shawe's use of Ng to obtain access to software blocking emails from Kramer Levin, an Elting Gmail to TransPerfect IT Director George Buelna concerning Boodram's computer access, an email reflecting Shawe's knowledge of NUIX software, and emails between Elting and Boodram on payroll issues. *See* JX-S 23 ¶ 21.

these deletions belie Shawe's attempt to rationalize his deletion of information out of concern for the security of his "personal, medical, and privileged" information.[92]

### K. Shawe's Expert Discovers the December 22 Deletions

On December 22, 2014, Shawe's counsel engaged Bandemer to assist in procuring information from Shawe's laptop to provide to Elting's counsel in order to comply with the Expedited Discovery Order.[93] Shawe did not tell Bandemer about his December 22 deletions or the December 20 Image that Wudke had created.[94]

On December 26, Bandemer received Shawe's laptop by Federal Express. He immediately imaged it, and began creating a file listing.[95] In doing so, he observed artifacts signaling the use of CCleaner, *i.e.,* many of the files had been renamed with "random Z characters."[96] Bandemer reported his findings about the deletions to Shawe's counsel on January 9, 2015.[97] On January 12, Shawe flew to San Diego to deliver the December 20 Image to Bandemer in person.[98] On January

---

[92] Tr. 502, 509 (Shawe).

[93] Tr. 195-99 (Bandemer); JX-S 9.

[94] Tr. 244, 272 (Bandemer).

[95] Tr. 199-200, 244 (Bandemer).

[96] Tr. 200 (Bandemer).

[97] Tr. 201 (Bandemer); JX-S 10 at 5.

[98] Tr. 274 (Bandemer); Tr. 516 (Shawe).

16, 2015, Shawe's professional responsibility counsel, Ronald Minkoff, sent a letter to Elting's counsel, which was filed with the Court the same day, disclosing the post-December 20 deletions to Shawe's laptop.[99] The letter reported that: "Mr. Shawe states as follows: After the Court issued the Expedited Discovery Order, Mr. Shawe continued to use his personal laptop in the ordinary course of business. At that time, he did not believe that the Expedited Discovery Order required him to disclose personal, medical or privileged material to Ms. Elting's counsel or anyone else."[100] The letter continued, stating that counsel had "recently learned" that Shawe had asked an "assistant to make a full forensic copy of the personal laptop, which was completed on December 20, 2014," and then "to delete certain files so as to produce the personal laptop with only the files relevant to the 'limited discovery' surrounding Elting/Kramer Gmails ordered by the Court."[101] The letter did not identify the referenced "assistant," and it did not disclose Shawe's December 19 deletions.[102]

---

[99] JX-S 10.

[100] *Id.* at 4.

[101] *Id.* at 5.

[102] *Id.*

Shawe testified he did not tell his lawyers about the deletion of files on his laptop until after Bandemer noticed them.[103] This is consistent with Minkoff's representation in his January 16 letter that counsel had "recently learned" that deletions were made to Shawe's laptop.[104]

## L. Shawe Provides False Interrogatory Answers

Shawe was scheduled for deposition about Gmail issues on January 20, 2015. The night before, Shawe verified under oath amended responses to interrogatories Elting had propounded.[105] Shawe's sworn responses were false in several important respects.

Interrogatory No. 5 asked Shawe to "Identify and describe each instance in which You have accessed the hard drive of Elting's TransPerfect computer."[106] Shawe referenced only the New Year's Eve incident. He omitted the other occasions when he took Elting's computer from her office and brought it to Wudke to extract information from it.[107]

Interrogatory No. 17 asked Shawe to "[i]dentify every person who may have knowledge of any facts concerning Your downloading a replica '.pst' file of

---

[103] Tr. 582 (Shawe).

[104] JX-S 10 at 5.

[105] JX-S 11.

[106] *Id.* at 6.

[107] *Id.*

Elting's Gmail account. For each person identified, describe the knowledge possessed by each such person."[108] In response, Shawe listed 27 people, five of whom he added in amending his responses.[109] Shawe did not identify Wudke.

Interrogatories 20, 21 and 23 asked Shawe to identify persons with knowledge of facts concerning, or who may have assisted him, in accessing or reviewing documents on Elting's hard drive.[110] Shawe answered by swearing that "there are no persons other than his counsel . . . with knowledge of any facts concerning his 'accessing or reviewing documents stored on the hard drive of Elting's TransPerfect computer,'" that "no other person assisted him in downloading replica '.pst' files of Elting's Gmail emails," and that "no person assisted him in accessing Elting's Gmail emails." [111] Once again, Shawe concealed Wudke's involvement.

## M. Shawe Provides False Testimony at His Deposition

Shawe appeared for deposition on January 20. During the deposition, Shawe again provided false testimony to conceal Wudke's involvement in accessing

---

[108] *Id.* at 12.

[109] *Id.* at 12-13.

[110] *Id.* at 15-16.

[111] *Id.*

Elting's hard drive as well his involvement in deleting information from Shawe's laptop.

When asked about the New Year's Eve extraction of information from Elting's hard drive, Shawe omitted Wudke from the story.[112] Instead, he falsely claimed to have imaged Elting's hard drive "personally" and to have exported the files himself using equipment he borrowed from Wudke.[113]

When asked to identify the "assistant" mentioned in Minkoff's January 16 letter who had helped Shawe delete information from his laptop just 30 days earlier, Shawe testified that it was Richards,[114] and that he had "tasked Mr. Richards" both with making "a mirror image copy" and with selecting and deleting supposedly "personal, privileged, or medical" documents.[115] According to Shawe, Richards not only was the person who made the deletions—Richards was the person who decided which files to delete.[116]

It was convenient for Shawe to name Richards as his accomplice because Shawe knew at the time that Richards was quitting his job with Shawe and heading

---

[112] Shawe Dep. 65-66 (Jan. 20, 2015).

[113] *Id.* at 66, 68-69.

[114] *Id.* at 142-43.

[115] *Id.* at 153.

[116] *Id.*

home to his family in the state of Washington.[117]  At 8:49 a.m. on January 20, shortly before Shawe's deposition, Richards sent Shawe a text message that said, simply, "Godspeed."[118]  Knowing that Richards would be gone and difficult to track down before the rapidly approaching Merits Trial, Shawe used Richards as a scapegoat.

### N.  Further Disputes as the Merits Trial Approaches

On January 23, 2015, Elting's counsel reported to the Court her concerns that Shawe had spoliated evidence on his laptop and had failed to comply with the Expedited Discovery Order by, among other things, not making his laptop available for inspection.  On January 28, Shawe's ethics counsel responded, stating that "Shawe understands the seriousness of 'spoliation' concerns arising out of his efforts to provide responsive information," and representing to the Court (with bold text in the original) that "Mr. Shawe arranged for a *full forensic image* of his personal laptop … on December 20, 2014, *before* any files were removed from the laptop."[119]  That representation, which only could have been made with Shawe's knowledge and approval, was false because, as discussed previously, Shawe had

---

[117] Tr. 424, 460 (Richards).

[118] JX-S 43 at 30.

[119] JX-S 13 at 1-2.

deleted almost 19,000 files from his laptop the day before the December 20 Image was made.

On February 2, 2015, after hearing argument on an application to require Shawe to comply with the Expedited Discovery Order, the Court issued another Order finding that "Shawe has failed to allow Elting to conduct forensic discovery of computers, telephones, and other devices or systems in his possession, custody, or control that may contain information relevant to the issues presented in the Expedited Discovery Motion, despite Elting having requested on multiple occasions that Shawe comply fully with the Expedited Discovery Order."[120] I further ordered that Shawe produce to Deloitte the December 20 Image within 72 hours.[121] Three days later, on February 5, Shawe sought "clarification" of this Order to allow Bandemer to oversee and limit Deloitte's inspection of the devices.[122] I rejected that application the same day.[123] Only at this point, with less than three weeks to go before the Merits Trial was scheduled to begin, did Deloitte receive the December 20 Image.[124]

---

[120] JX-S 15 at 2.

[121] *Id.* at 3.

[122] C.A. No. 9700-CB, D.I. No. 336.

[123] C.A. No. 9700-CB, D.I. No. 337.

[124] Tr. of Post-Hearing Oral Arg. 157 (Apr. 27, 2016).

On February 11, 2015, during another pre-trial hearing, Shawe's counsel acknowledged that Shawe had made no effort to preserve or collect his text messages.[125] Shawe also informed the Court for the first time that his "prior phone broke in November [2014]," with his counsel expressing uncertainty "what the state of being able to retain those . . . text messages is" while suggesting the presence of "a forensic consultant who will do that investigation."[126] Shawe was ordered to produce personal emails and "text messages that involve any communications with any of the 32 employees that were the subject of subpoenas" Elting had served previously.[127] His counsel also was to provide a certification "regarding whether any deletions occurred to" Shawe's text messages or Gmails.[128]

On February 15, 2015, Shawe produced two weeks' worth of text messages with the subpoenaed employees, a total of 537 text messages, many of which were

[125] Hr'g Tr. 59, 63-64 (Feb. 11, 2015).

[126] *Id.* at 66-67.

[127] *Id.* at 76-77. Shawe frequently communicated with Company employees through personal emails and text messages. In November, Elting had served subpoenas on 32 employees to obtain such communications, but counsel that Shawe hired for them objected to the subpoenas and the employees refused to produce documents to Elting without a fight. C.A. No. 9700-CB, D.I. 178, Ex. 43. Thus, the most practical way to obtain Shawe's personal emails and text messages with the employees in time for the Merits Trial was to get them from Shawe.

[128] Hr'g Tr. 77 (Feb. 11, 2015).

relevant to the issues in the case.[129]  That same day, Minkoff stated in an affidavit that "Shawe has been unable to locate" his cell phone.[130]

On February 19, 2015, the Court held a pre-trial conference and heard arguments on several motions *in limine*, including whether to order production of Shawe's communications involving Richards.[131]  With respect to Shawe's missing iPhone, counsel for Shawe represented that they were "looking into [locating the phone] even as we speak" and said that a "niece of Mr. Shawe's named Ava dropped his phone into a Coke." [132]  Counsel continued, stating:  "It is a work in progress to try to track it down [and it] may still exist, Coke and all.  And it was handled by a TransPerfect employee who assists Mr. Shawe . . . as I understand it, he will attest that when he got it, it was in no condition for salvage or could not be salvaged.  He [Campbell] has that technical ability."[133]  The last statement grossly overstated Mr. Campbell's "technical" abilities with iPhones.

Also on February 19, the Court ordered Shawe to produce communications with Richards, including text messages, from the 30-day period before and after

---

[129] *See* JX-S 18 at 6, 12, 19; Hr'g Tr. 100-05 (Feb. 19, 2015).

[130] JX-S 17 ¶ 10.

[131] Hr'g Tr. 163-86 (Feb. 19, 2015).

[132] *Id.* at 126-27.

[133] *Id.*

"the date on which e-mails were deleted from Mr. Shawe's laptop."[134] The Court ordered that Richards produce the same documents, noting that, according to representations by Shawe and his counsel, Richards "[p]resumably[ ] [is] acting under Mr. Shawe's control and should take the direction to produce such information."[135] Shawe did not disclose at this time that Richards already had quit working for him.

Of the text messages Shawe produced after the February 19 hearing, nearly 200 were between Richards and Shawe.[136] The texts ended on January 15, 2015. They did not include the "Godspeed" text of January 20.[137]

---

[134] *Id.* at 183-85.

[135] *Id.* at 184.

[136] JX-S 21. The Court also conducted during trial an *in camera* review of communications between Shawe and Richards over which privilege had been asserted, and ordered the production of many of these documents. *See* C.A. No. 9700-CB, D.I. No. 486.

[137] Elting argues that the failure to produce the "Godspeed" text message from Richards violated the Court's February 19 order. That order, which was delivered orally, required the production of text messages between Shawe and Richards 30 days before and 30 days after "the date on which emails were deleted from Mr. Shawe's laptop." Given that the focus at the time was on deletions Shawe made *after* the December 20 Image was made, the "Godspeed" text message of January 20 should have been produced. I am not prepared, however, to find that the failure to do so was done in intentional disregard of a court order because of the imprecise wording of the oral ruling.

**O. Shawe Testifies Falsely at the Merits Trial and Submits a False Affidavit During Post-Trial Briefing**

The Merits Trial began on February 23, 2015. During the third day of trial, Shawe falsely testified (again) that it was Richards who made the December 20 Image and that it was Richards who performed the deletions on his laptop:

> Q. When you gave your laptop to Mr. Richards, you instructed him to make a full backup or mirror image of everything stored on the laptop; correct?
>
> A. Correct.
>
> Q. But you also instructed him at that same time to delete everything from the computer that he did not regard as responsive to Ms. Elting's discovery; correct?
>
> A. My words were redact and sequester everything that didn't have – that was personal, that didn't have to do with the Gmails, such as my family photos and things like that.
>
> Q. Yeah. But you left it up to him to decide what was responsive or relevant and what wasn't; right?
>
> A. That's correct. . . . [138]

Shawe also falsely disclaimed any knowledge of how the December 20 Image was made and which files had supposedly deleted:

> Q. Let me ask you this, Mr. Shawe: Do you know how the image was made?
>
> A. I don't.
>
> Q. Do you know where it was made?
>
> A. I don't.

---

[138] Trial Tr. 871-72 (Feb. 25, 2015).

Q. Do you know exactly what files Mr. Richards deleted?

A. I do not know exactly what files, but I do know that from comparing the subsequent image that I gave to the original image, you could – you could figure that out.[139]

Shawe again concealed Wudke's role in making the December 20 Image and in deleting files from the laptop, and Shawe acted as if someone else selected the files to be deleted when it was Shawe who directed which files to delete. Shawe also failed to mention Wudke in the context of the December 31, 2013 search of Elting's office,[140] and he falsely testified that no deletions were made before the December 20 Image was created:

Q. Now, Mr. Shawe, even before you gave your laptop to Mr. Richards, you yourself deleted or had someone else with technical skill delete files from that device, didn't you?

A. I -- I don't think that's true, no.

Q. Are you certain of that, Mr. Shawe?

A. I didn't have anyone delete anything from the laptop. There would be no purpose.

Q. Did you?

A. No.[141]

Once again, it was convenient for Shawe to use Richards as the fall guy to conceal Wudke's involvement. The same day Shawe provided the testimony

---

[139] *Id*. at 875.

[140] *See id*. at 861-64.

[141] *Id*. at 875.

32

quoted above during the Merits Trial, his counsel disclosed to the Court that Richards had "resigned from his position as a paralegal at the end of January," and that, despite "efforts to get in contact with him since that time," Richards "is not responsive" to either Shawe or counsel.[142]

On April 3, 2015, in connection with post-trial briefing, Shawe submitted an affidavit in opposition to the Sanctions Motion in which he reiterated the lie that Richards was the person who made the December 20 Image and who deleted files from his laptop:

> I understand Ms. Elting also claims that I subsequently spoliated electronic files relating to the Elting Gmails as well as text messages relating to discovery issues in these actions. This is also untrue. After first instructing my paralegal Nathan Richards to make a mirror image of my laptop – and thereby preserve it – I requested that he delete certain irrelevant, personal information that I feared would be misused by Ms. Elting. No relevant information on that laptop was lost.[143]

In the same affidavit, Shawe swore that Campbell "misplaced" his damaged iPhone and that it "cannot be located."[144] This statement also was false because, as

---

[142] *Id.* at 605.

[143] JX-S 28 ¶ 3.

[144] *Id.* ¶¶ 3, 25. In a brief accompanying this affidavit, it was stated that Campbell was "unable to revive the device and therefore discarded it," as if one followed from the other. Tr. 325-26 (Campbell). That characterization does not square with Campbell's version of events.

Shawe knew from speaking to Campbell months before Shawe signed his affidavit on April 3, Campbell did not "misplace" Shawe's iPhone – he had thrown it out.[145]

## P.   The Merits Opinion and the Sanctions Hearing

On August 13, 2015, the Court issued the Merits Opinion. Based on false testimony Shawe provided at trial and his concealment of Wudke's involvement through repeated false statements under oath, the Merits Opinion incorrectly states that it was Richards who had assisted Shawe in deleting files from his laptop, when in reality it was Wudke who had done so.[146]

As noted in the Merits Opinion, Shawe objected to having the Sanctions Motion decided based on facts not admitted at trial, such as affidavits that had been submitted by the computer forensic experts.[147] For this reason, and given the seriousness of the issues raised in the Sanctions Motion, I deferred ruling on it pending the holding of an evidentiary hearing. On November 13, 2015, the Court entered an order scheduling the Sanctions Hearing for January 7-8, 2016.

---

[145] As discussed above, Campbell testified during the Sanctions Hearing that he told Shawe in January 2015 that he had thrown the phone out. Tr. 292, 296-97 (Campbell). Campbell also testified that he told Shawe's lawyers the full story of the iPhone, including that he had thrown it out, but the date of this meeting is a matter of dispute. In his deposition before the Sanctions Hearing, Campbell initially placed the date of his meeting with Shawe's lawyers in January 2015, but he submitted an errata sheet changing that answer to say the meeting with Shawe's lawyers occurred on March 16, 2015, which is how he testified at the Sanctions Hearing. Tr. 315 (Campbell).

[146] 2015 WL 4874733, at * 24.

[147] *Id*. at * 25.

34

On November 25, 2015, a newly retained member of Shawe's legal team (David L. Finger) emailed Elting's counsel to add Wudke to Shawe's previously exchanged witness list, saying that he had "just learned" that Wudke "was the party who, at Nate Richards' request, made the forensically valid copy of the hard drive of Mr. Shawe's laptop."[148] This disclosure prompted Wudke's deposition, during which the true nature of his involvement in the extraction of information from Elting's hard drive, the creation of the December 20 Image, and the subsequent deletion of files from Shawe's laptop all came to light for the first time.

At the Sanctions Hearing, Shawe continued to insist that his concern about his laptop involved only "personal" files.[149] Shawe professed to be confused between Wudke and Richards,[150] he recalled Wudke as a "passive" participant[151] who was kept on a "need-to-know" basis,[152] but Shawe ultimately did not dispute Wudke's testimony.[153]

---

[148] JX-S 37.

[149] Tr. 577 (Shawe).

[150] Tr. 555-59 (Shawe).

[151] Tr. 531 (Shawe).

[152] Tr. 538 (Shawe).

[153] Tr. 485, 556 (Shawe).

## II. LEGAL ANALYSIS

### A. Legal Standard

Delaware follows the "American Rule" under which courts generally do not award attorneys' fees to prevailing parties in litigation.[154] A well-recognized exception to this rule is when the "losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"[155] "The purpose of this exception is not to award attorney's fees to the prevailing party as a matter of right, but rather to 'deter abusive litigation in the future, thereby avoiding harassment and protecting the integrity of the judicial process.'"[156] Delaware courts have shifted fees upon finding that a party "delayed the litigation, asserted frivolous motions, falsified evidence and changed their testimony to suit their needs."[157] "[A]ny one of these findings alone would be sufficient to justify a shifting of fees,"[158] and the "Court of Chancery has broad discretion in fixing the amount of attorney fees to be awarded."[159]

---

[154] *Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 506 (Del. 2005).

[155] *Brice v. State Dept. of Corrs.*, 704 A.2d 1176, 1179 (Del. 1998) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975)).

[156] *Id.* (quoting *Schlank v. Williams*, 572 A.2d 101, 108 (D.C. 1990).

[157] *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998).

[158] *ATR-Kim Eng Fin. Corp. v. Araneta*, 2006 WL 3783520, at \*22 (Del. Ch. Dec. 21, 2006) (Strine, V.C.) (awarding attorneys' fees where defendant "engaged in a deliberate pattern of obfuscation ranging from the obstruction of legitimate discovery requests, to the presentation of baseless and shifting defenses, and ultimately to the telling of outright

Because the remedy of shifting fees for bad faith is an extraordinary one, the "bad faith exception is not 'lightly invoked.'"[160] To shift fees, "a finding that the defendants acted in bad faith must be based upon clear evidence."[161] In its most stringent formulation, the Court of Chancery has held that "the bad faith exception only applied when the party in question displayed 'unusually deplorable behavior.'"[162]

Shawe's conduct meets all of these standards. For the reasons discussed below, clear evidence adduced at the Sanctions Hearing establishes that Shawe acted in bad faith and vexatiously during the course of this litigation in three respects which, in my view, constitute unusually deplorable behavior: (1) by intentionally attempting to destroy information on his laptop computer after the Court had entered an order requiring him to provide the laptop for forensic

lies under oath and the submission of a phony defense . . . ."), *aff'd*, 930 A.2d 928 (Del. 2007) (TABLE).

[159] *Johnston*, 720 A.2d at 547; *accord Kaung*, 884 A.2d 500, 506 ("The Court of Chancery's discretion is broad in fixing the amount of attorneys' fees to be awarded.")

[160] *Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 880 (Del. Ch. 2012) (Strine, C.) (quoting *Nagy v. Bistricer*, 770 A.2d 42, 64 (Del. Ch. 2000)), *aff'd*, 59 A.3d 1206 (Del. 2012).

[161] *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d 225 (Del. Ch. 1997), *aff'd*, 720 A.2d 542 (Del. 1998).

[162] *ATR-Kim*, 2006 WL 3783520, at *23 (quoting *Barrows v. Bowen*, 1994 WL 514868, at *2 (Del. Ch. Sept. 7, 1994) (Allen, C.), and describing that test as "more stringent than that articulated recently by our Supreme Court in *Kaung v. Cole National Corp.*").

discovery, (2) by, at a minimum, recklessly failing to safeguard evidence on his phone, which he regularly used to exchange text messages with employees and which was an important source for discovery, and (3) by repeatedly lying under oath to conceal aspects of his secret extraction of information from Elting's hard drive and the deletion of information from his laptop.

## B. Shawe Intentionally Sought to Destroy Evidence He Was Judicially Ordered to Make Available for Forensic Discovery

On December 11, 2014, the Court entered the Expedited Discovery Order. It followed the initiation of litigation in May, the service of discovery requests from Elting, and the issuance of two Litigation Hold Notices (in April and September) that should have made it abundantly clear to Shawe many months earlier that he had a duty to preserve electronic information. But the Expedited Discovery Order went further. It explicitly granted Elting leave to conduct *forensic discovery* of Shawe's computers, phones and other devices concerning his review of Elting's Gmails, and it specifically directed Shawe "to allow and cause to be allowed any such *forensic discovery*."[163] Shawe's laptop computer indisputably was central to and fell within the ambit of the Expedited Discovery Order.

A court order is a serious matter and should be treated with the utmost gravity. One reasonably would expect that Shawe, faced with the mandate of a

---

[163] JX-S 6 ¶ 6 (emphasis added).

court order requiring him to allow "forensic discovery" of his electronic devices, immediately would have turned over his laptop to a member of his vast legal team (which was in the process of engaging the assistance of a forensic computer expert) to ensure that all the information on it was preserved. But, in a very calculated and devious way, Shawe chose a different path. He proceeded on two separate occasions, in secret and without the assistance of counsel,[164] to delete a substantial amount of information from the laptop. "The most natural inference that arises when sophisticated people act secretively in a process that is governed by a court order and that has been placed under the purview of counsel to ensure compliance is that they have something to hide."[165] Here, no such inference is necessary because the record shows that many of the deleted files that were recovered were directly relevant to the Merits Trial.[166] More broadly, the record shows, and I find, that the intended purpose of Shawe's actions was to make information unavailable for the required forensic discovery in direct contravention of the Expedited Discovery Order. But for two fortuitous events, Shawe would have succeeded.

The first set of deletions, consisting of almost 19,000 files, occurred on December 19. All but 1,068 of these files eventually were recovered through use

---

[164] *See supra* Part I.K.

[165] *TR Investors*, 2009 WL 4696062, at *9.

[166] *See supra* Part I.H.

of the volume shadow copy system in the laptop's operating system. Tellingly, the record is devoid of any evidence that Shawe expected that the files he deleted on December 19 would be recoverable. He did not testify that he was familiar with the volume shadow copy system generally, or how it operated on his laptop specifically, such as how often and when it would generate images of the laptop's hard drive. Based on all the evidence, and having observed Shawe's demeanor in trying to explain why he would delete files *before* making a mirror image of his laptop, I conclude that Shawe fully intended and attempted to destroy a substantial amount of information from his laptop on December 19 but, through the fortuity of the volume shadow copy system, was unsuccessful in doing so in a permanent and irretrievable manner. Being an ineffective spoliator does not negate the intention to spoliate.[167]

The second set of deletions, consisting of approximately 22,000 files, occurred on December 22. Unlike the December 19 deletions, the record does not support the inference that Shawe intended to destroy these files permanently because he already had created the December 20 Image from which the deletions could be restored.[168] That is not to say that the December 20 deletions were

---

[167] *See TR Investors*, 2009 WL 4696062, at *9 ("Admittedly, this was a clumsy effort. But tricksters are often ham-handed, and they are not absolved of wrongdoing simply because their improper conduct was not completely effective.")

[168] Technically, as Wudke testified and the experts agreed, one would not be able to recover files created and deleted between the making of the December 20 Image and the

proper. To the contrary, Shawe intended to make these files unavailable for the forensic review in a different way—by trying to sneak one past his computer expert, who had just been hired. In pursuit of this plan, Shawe sent his laptop to Bandemer without disclosing to him (or to Shawe's own counsel) that he had deleted information from it on December 19 and 22. It was not until after Bandemer discovered evidence of deletions and reported his findings to Shawe's lawyers that Shawe sent him the December 20 Image. No logical reason comes to mind why Shawe would do this except the obvious one—he was hoping to get away with it and made the December 20 Image to use as a "get out of jail free card" in case he got caught.

Shawe seeks to justify the deletions he made because the scope of discovery in the Expedited Discovery Order was "limited to the issues surrounding the Gmail account emails," and it did not "order Shawe's laptop immediately impounded or imaged."[169] That "justification" is meritless. The central point of the Expedited Discovery Order was to make Shawe's laptop (and other devices) available for

_____

time the December 22 deletions were made. Tr. 52 (Schilo); Tr. 247-49 (Bandemer); Tr. 383-84 (Wudke). The loss of this information, however, is not a basis for sanctions in my view. Although one may need to supplement a discovery response in certain circumstances, *see* Ct. Ch. R. 26(e), no authority has been provided in which an obligation has been imposed to continually image a computer to comply with the discovery rules. The core of the wrongdoing at issue here stems from Shawe's failure to safeguard the information on his laptop promptly after the Expedited Discovery Order was entered, before engaging in two rounds of deletions.

[169] JX-S 6, 4-5.

"forensic discovery" concerning Elting's Gmails. It was not a license to self-define the universe of information to be searched forensically.

The record shows, furthermore, that Shawe—who chose the files to delete from his laptop on both occasions—caused the deletion of Elting Gmails and documents about them from his laptop, including a "Partner" folder that contained Elting Gmails that Shawe felt were important or noteworthy; voicemails from Elting's lawyers, which he obtained as attachments to Elting's Gmails; and records of searches Shawe conducted of his own Gmails for references to Elting's Gmails.[170] Thus, even under his own erroneous reading of the Expedited Discovery Order, Shawe intentionally violated it. The nature of these deletions also squarely puts the lie to Shawe's rationalization that he was just seeking to remove personal information from the laptop.

Because of the volume shadow copy system on his laptop and because of Bandemer's intervention, all of the approximately 41,000 files that Shawe deleted from his laptop ultimately were recovered except for 1,068 files. It is not possible to know with certainty what information was contained in these unrecoverable files.[171] Ordinarily, one would infer in this circumstance that the destroyed

---

[170] Tr. 71-72, 75-77 (Schilo); Tr. 578-79 (Shawe).

[171] Bandemer testified that "those files were largely of the temporary type of files associated with Internet browsing and the kinds of files such as history files, the graphics, icons, the type of things that get downloaded to your computer when you browse the

information would be adverse to the spoliator's litigation position.[172] Giving Shawe every benefit of the doubt, I am reluctant to draw such an inference here because the files that were destroyed logically must have been both *created and deleted* within a very narrow window between when the volume shadow copy snapshot was made on December 19 and when Wudke imaged Shawe's laptop on December 20,[173] and because this narrow window occurred *after* the Expedited Discovery Order had been entered. Thus, I consider the possibility that the unrecoverable files concerned Elting's Gmails to be rather remote.

---

Internet." Tr. 233 (Bandemer). The basis for this testimony is not clear to me and, in any event, Bandemer could not account for all of the 1,068 permanently deleted files.

[172] *Beard Research*, 981 A.2d at 1192 ("[D]rawing an adverse inference is appropriate when an actor is under a duty to preserve evidence while being consciously aware of a risk that he or she will cause or allow evidence to be spoiled by action or inaction and that risk would be deemed substantial and unjustifiable by a reasonable person."); *see also Equitable Trust v. Gallagher*, 102 A.2d 538, 541 (Del. 1954) ("It is the duty of a court, in such a case of wil[l]ful destruction of evidence, to adopt a view of the facts as unfavorable to the wrongdoer as the known circumstances will reasonably admit. The maxim is that everything will be presumed against the despoiler."); *Triton*, 2009 WL 1387115, at *9 ("In the case of [defendant's] Work Computer, the availability of the ghost copy presumably supplies most of the missing information. To the extent there are any significant gaps, however, it is appropriate to infer that the missing information would have supported [plaintiff's] position on any issue to which that information was relevant."); *TR Investors*, 2009 WL 4696062, at *16 ("For a party to intentionally violate an order not to destroy or tamper with information and then to claim that he did little harm because no one can prove how much information he eradicated takes immense chutzpah. For a court to accept such a defense would render the court unable to govern situations like this in the future, as parties would know that they could argue extenuation using the very uncertainty their own misconduct had created.").

[173] Tr. 233, 260 (Bandemer).

Although I am not convinced that Shawe's laptop deletions resulted in the permanent destruction of relevant evidence, his conduct prejudiced Elting's ability to litigate effectively, drove up the costs of the litigation, and wasted the Court's resources. As a result of Shawe's actions, Elting did not receive access to the information on Shawe's laptop until the first week of February—almost two months after the Expedited Discovery Order was entered on December 11, and less than three weeks before the Merits Trial was scheduled to begin on February 23. Shawe's attempts to spoliate documents on his laptop necessitated last-minute diversions to discover the facts before an already expedited trial, necessitated collateral proceedings within the Merits Trial, and precipitated the need for the Sanctions Hearing.[174]

### C. Shawe Recklessly Failed to Safeguard Evidence on His Cell Phone

A party in litigation has a duty to "preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during

---

[174] *See Auriga*, 40 A.3d 839, 881 ("[Defendant] and his counsel also created evidentiary uncertainty by . . . having [defendant], who appears not to have been adequately counseled by his legal advisors, delete relevant documents while litigation was either pending or highly likely. The constant presentation of arguments that were not plausible resulted in excess work by the court and, most important, by counsel for the [plaintiffs].")

discovery and/or is the subject of a pending discovery request."[175]   Shawe's missing cell phone fits into each of these categories.

Shawe frequently used text messages to communicate with employees of TPG and others who worked for him personally, such as Richards.   Those communications were an important source of discovery that were reasonably calculated to yield information relevant to the Merits Trial, such as evidence of deadlocks between the Company's co-CEOs and the bias of witnesses who testified on Shawe's behalf.   Indeed, many text messages retrieved from Shawe's *next* phone provided relevant evidence at the Merits Trial.[176]

It was reckless for Shawe not to take measures to safeguard the information on his phone early in the merits litigation.   By September 2014, Shawe knew he had a duty to preserve this information as he was embroiled in multiple litigations in Delaware as well as in New York, discovery had been served on him, and two Litigation Hold Notices that covered text messages had been issued, including one he issued himself.

The timing of the "1 out of 100,000" submergence of Shawe's iPhone into a plastic cup of Diet Coke—coming just four days after an expedited trial was

---

[175] *TR Investors*, 2009 WL 4696062, at *17 (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003)); *see also Beard Research*, 981 A.2d at 1185; *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *29 (Del. Ch. July 22, 2015).

[176] *See supra* Part I.N.

ordered—raises an eyebrow of suspicion about what really happened to the phone. But the evidence concerning the loss of the phone is palpably suspicious. Campbell's story of having such a "visceral" reaction to seeing rat droppings in his office desk drawer that he spontaneously threw out the phone is so preposterous that it is not even recounted in Shawe's own brief.

The record also shows that Shawe has a demonstrated propensity to use subordinates firmly under his control to do dirty work for (and with) him in secret, off the grid, and usually late at night. He turned to Wudke late on New Year's Eve (and other occasions) to extract files from Elting's hard drive and told him not to document what he was doing even though he insists it was part of a legitimate "corporate" investigation. He hired Richards as his "personal paralegal" at the princely rate of $30,000 per month despite having a number of reputable law firms with vast resources at his disposal, and immediately tasked him with photographing Elting's office and removing documents from it in the wee hours of the morning. When it came to his iPhone, he turned to another trusted subordinate, Campbell, who sits next to him in the same office in New York. Given Shawe's *modus operandi* and Campbell's farcical explanation of what happened to the phone when Elting was pressing for discovery of Shawe's text messages, it is more likely that Shawe told or otherwise made it clear to Campbell to get rid of the phone. In any event, whether Shawe did so or not is of no moment because, at a

46

bare minimum, he recklessly failed to take appropriate measures to preserve the phone so that genuine efforts to recover information from it could have been utilized.

Shawe is the co-CEO of a company specializing in e-discovery, which employs personnel qualified to conduct forensic recovery of damaged devices,[177] and which has relationships with other professionals who can assist if needed.[178] Shawe was represented by an able team of counsel, who engaged a forensic computer expert[179] and who easily could have engaged an expert in data recovery if Shawe had been genuinely interested in trying to recover evidence on his phone. Faced with an embarrassment of riches in terms of professionals to whom he could turn to recover data from his phone, Shawe instead inexplicably chose to give the phone to a subordinate under his control who had no forensic training in retrieving data from a phone.[180] Campbell's sole experience is that his own phone once fell into a toilet and it worked after he let it dry.[181] To top it off, Shawe gave the phone to Campbell without providing him even minimal instructions about why he

---

[177] Tr. 307 (Campbell); Tr. 388 (Wudke).

[178] Tr. 389 (Wudke).

[179] Tellingly, in the one instance when Shawe turned one of his devices to someone not under his control (Bandemer), as opposed to one of his subordinates, he was caught in an act of deception.

[180] Tr. 307 (Campbell).

[181] Tr. 288, 307-08 (Campbell).

wanted him to attempt to revive the phone, the need to preserve the evidence given the pending litigations, or even about ensuring an appropriate chain of custody.

Taking into account all evidence of record, I find that Shawe's failure to safeguard information on his phone earlier in the litigation (certainly by September 2014) and his decision to entrust his damaged phone to Campbell amounted to a reckless failure to safeguard evidence. Delaware Courts have defined "recklessness" in this context as "as a conscious awareness of the risk that one's action or inaction may cause evidence to be despoiled."[182] Given Campbell's limited capabilities and Shawe's lack of instructions regarding preservation obligations, Shawe was aware, or certainly should have been aware, that giving Campbell the cell phone created—at a minimum—a high risk of losing evidence. As with Shawe's laptop deletions, his actions prejudiced Elting by making it impossible for her to search an important source for relevant evidence before the

---

[182] *TR Investors*, 2009 WL 4696062, at *17 (citing *Beard Research*, 981 A.2d at 1192 ("Reckless conduct reflects a knowing disregard of a substantial and unjustifiable risk. It amounts to an 'I don't care attitude.'")).

Merits Trial, [183] and by needlessly protracting and increasing the cost of the litigation. [184]

## D. Shawe Knowingly Provided False Testimony

Under Delaware law, "[a] person is guilty of perjury in the third degree when the person swears falsely." [185] "Perjury is obvious bad faith." [186] Shawe's repeated false statements under oath during the course of this litigation plainly support the conclusion that Shawe subjectively acted in bad faith to obstruct discovery and conceal the truth about activities relevant to this case.

Shawe's false statements under oath concerning the deletions to his laptop, the concealment of Wudke's role in those deletions and in the extraction of emails from Elting's hard drive, and the nature of Richards' involvement (or lack thereof)

---

[183] As noted previously, Elting served subpoenas on 32 employees of the Company in order to obtain their personal emails and text messages with Shawe, but that discovery was essentially shut down after Shawe hired counsel for them. *See supra.* note 127. Even if that avenue were available, it is no defense to one's reckless failure to safeguard evidence. *See Kan-Di-Ki*, 2015 WL 4503210, at *30 (rejecting defense to spoliation of text messages based on failure to produce "other-ends").

[184] Citing to documents outside the Sanctions Hearing record, Shawe seeks to deflect attention from his actions by focusing on Elting's handling of her electronic devices. *See* Ans. Br. 13. Those matters are irrelevant to the issues before the Court. *See Kan-Di-Ki*, 2015 WL 4503210, at *30 (rejecting defense to spoliation of text messages based on plaintiff's own failure "to produce a large number, or perhaps any, text messages of its own.").

[185] 11 Del. C. § 1221.

[186] *Arbitrium*, 705 A.2d at 236 n.44 (quoting *Bower v. Weisman*, 674 F.Supp. 109, 112 (S.D.N.Y. 1987)).

in these activities, took seemingly every form imaginable. As detailed above, Shawe provided false statements on these topics (1) in his sworn interrogatory responses in January 2015, (2) during his deposition on January 20, 2015, (3) on the witness stand at the Merits Trial, and (4) in an affidavit submitted on April 3, 2015, after the Merits Trial.

Shawe's testimony that he may have confused Richards with Wudke when testifying about who deleted the files from his laptop strains all credibility. Shawe was *in the same room with Wudke* directing him to make the deletions on December 22, less than 30 days before he was deposed on January 20. Having observed Richards and Wudke at trial, they do not lend themselves to confusion in their physical characteristics or their computer skills. Wudke was a qualified computer expert, who knew exactly how to image a hard drive and to securely delete files. Richards was a makeshift "paralegal" who had no such skills.[187]

During his deposition, when he falsely fingered Richards for the December 22 deletions, Shawe knew that Richards was quitting his tour of duty with Shawe and leaving town. Just that morning, Shawe had received the "Godspeed" text message from him. Shawe was not confused, but was very deliberate in perpetuating a lie because he knew Richards would be difficult to track down

---

[187] Richards was not even in the country on December 22, 2014—he was in London. Shawe knew this at the time. On December 24, Shawe sent Richards a "text asking how Europe was and wishing [him] Merry Christmas." Tr. 450-51 (Richards).

before the Merits Trial. Wudke, on the other hand, was a current TPG employee who easily could have been available for deposition and trial testimony concerning the laptop deletions, which likely would have shed light on other aspects of Shawe's secret activities. In short, Shawe used Richards as a convenient fall guy to prevent Wudke from being deposed in order to conceal the truth about Shawe's extraction of Elting's Gmails and laptop deletions.

There also is no excuse for Shawe's failure to identify Wudke in his sworn responses to Elting's interrogatories, which specifically called for the identity of every person knowledgeable about accessing Elting's hard drive or the making a replica of the ".pst" file of her Gmails.[188] Wudke again was in the same room as Shawe when this occurred. This was not an act of confusion—it was one of concealment to prevent the truth of Shawe's activities from being discovered and probed.

In sum, I find that Shawe's pervasive false statements under oath concerning who assisted him in accessing Elting's hard drive and the deletions made to his laptop were made intentionally to conceal the truth of his surreptitious activities. These actions had the effect of obstructing the administration of justice, prejudiced Elting's ability to fully develop the record at the Merits Trial, and protracted the

---

[188] JX-S 11 (Interrogatory Nos. 17, 20, 21, 23 and 27).

proceedings.[189] They also had another pernicious effect. As noted above, Shawe's false testimony misled the Court and caused Richards to be identified mistakenly in the Merits Opinion as a participant in the December 22 deletions to Shawe's laptop.[190] Richards credibly testified that he was "horrified" when he saw this.[191]

## E.    Remedy

"In determining what remedy to award for spoliation, the court should consider (1) the culpability of the spoliating party; (2) the degree of prejudice suffered by the aggrieved party; and (3) the availability of lesser sanctions that could both avoid unfairness to the aggrieved party and serve as an adequate penalty to deter such future conduct."[192] More generally, "[t]o award fees under the bad faith exception, the party against whom the fee award is sought must be found to have acted in *subjective* bad faith."[193] The Court evaluates the totality of a party's

---

[189] *See Hardy v. Hardy*, 2014 WL 3736331, at *18 (Del. Ch. July 29, 2014) ("false statements under oath, among other things, warrant fee shifting" in a case where behavior by defendants "unnecessarily increased [plaintiff's] litigation expenses.")

[190] 2015 WL 4874733, at *24.

[191] Tr. 450 (Richards). This Court has sanctioned bad faith conduct by a defendant which evidenced "a willingness to put an innocent administrative employee of his at risk by falsely suggesting" actions taken by that employee. *ATR-Kim*, 2006 WL 3783520, at *2; *see also id.* at *7 ("[Defendant] seems to have created this fiction in order to set up a phony defense to this court's jurisdiction and to claim that [the employee] was responsible for any misfeasance at the [company] . . . –a futile exercise in 'plausible deniability.'").

[192] *TR Investors*, 2009 WL 4696062, at *18 (citing *Beard Research*, 981 A.2d at 1189).

[193] *Arbitrium,* 705 A.2d 225, 232.

misconduct to determine whether the party litigated in bad faith and to determine the amount of fees to award.[194]

As to each category of conduct discussed above, Shawe's bad faith has been proven by clear evidence. His deletions to the laptop on December 19 and 22—done in secret, without the involvement of counsel, and in the face of a court order—were done intentionally for the purpose of making files unavailable for the forensic discovery the Court had ordered. Shawe may not have succeeded in his goal because of events beyond his control—the fortuity of the laptop's volume shadow copy system and Bandemer's intervention—but that does not negate his illicit intent. His failure to safeguard evidence from his iPhone, an important source of discovery given his frequent use of text messages, by not safeguarding it in the first place and by turning the allegedly damaged phone over to a subordinate under his firm control who was not competent to recover information from it was, at a minimum, reckless, and potentially much worse. And his repeated, intentional, making of false statements under oath concerning the laptop deletions and the extraction of Gmails from Elting's hard drive was flagrant and calculated—the epitome of subjective bad faith.

Each form of Shawe's misconduct prejudiced Elting's ability to fully develop the record for, and needlessly complicated the litigation of, the Merits

---

[194] *ATR-Kim*, 2006 WL 3783520, at *22.

Trial. Shawe's actions also necessitated holding a second evidentiary hearing to address the issues raised by the Sanctions Motion.

In exercising its discretion to determine an appropriate sanction for bad faith and vexatious litigation conduct,[195] this Court has shifted a portion of, and on occasion the entirety of, the opposing side's attorneys' fees.[196] Here, the sensible starting point is to shift to Shawe all reasonable attorneys' fees and expenses (including expert expenses) Elting incurred in prosecuting the Sanctions Motion.[197] An additional amount is appropriate because Shawe's bad-faith misconduct significantly complicated and permeated the litigation of the Merits Trial, from at least December 2, 2014, the date on which Elting sought expedited discovery in aid of her later-filed Sanctions Motion, until its conclusion. For that period, an

---

[195] *See, e.g.*, *Johnston*, 720 A.2d at 547; *Kaung*, 884 A.2d at 506; *see also Beard Research*, 981 A.2d at 1189 ("The Court has the power to issue sanctions for discovery abuses under its inherent equitable powers, as well as the Court's 'inherent power to manage its own affairs.'"); Ct. Ch. R. 37(b)(2) ("If a party . . . fails to obey an order to provide or permit discovery, . . . the Court may make such orders in regard to the failure as are just.").

[196] *See, e.g. ATR-Kim*, 2006 WL 3783520, at *23 (defendant, whose conduct "made the procession of the case unduly complicated and expensive . . . easily qualifies for an order requiring him to pay [plaintiff's] attorneys' fees and expenses."); *Arbitrium*, 705 A.2d at 237 (Because "bad faith conduct . . . permeated virtually [the] entire litigation, that alone would justify an award of all of the plaintiffs' attorneys' fees.")

[197] *See, e.g.*, *TR Investors*, 2009 WL 4696062, at *19 ("because [defendant's] misconduct has occasioned great expense, I award [plaintiffs] their reasonable attorneys' fees and expenses related to the motions for contempt and spoliation."); *Kan-Di-Ki*, 2015 WL 4503210, at *30 (awarding plaintiff "the reasonable attorneys' fees and expenses it incurred in filing and prosecuting its Motion for Sanctions.").

appropriate sanction is to shift to Shawe a reasonable percentage of the attorneys' fees and expenses Elting incurred in connection with the Merits Trial because Shawe's misconduct unduly complicated and drove up the costs of that proceeding.[198] Based on my deep familiarity with the twists and turns of this case, 33% is a reasonable approximation to compensate Elting fairly for that time period.

To sum up, as a sanction for the conduct discussed above, Shawe will be ordered to pay Elting the following amount: (1) 33% of her attorneys' fees and expenses incurred in connection with the litigation of the Merits Trial (including computer expert expenses but not including other experts) from December 2, 2015 up to the resolution of the Merits Trial, *i.e.*, the date on which the Merits Opinion was issued, plus (2) 100% of her attorneys' fees and expenses (including computer expert expenses) incurred in connection with the litigation of the Sanctions Hearing.

---

[198] In cases where shifting the entirety of fees was not appropriate, this Court has used percentage approximations to determine an appropriate amount of fees to shift. *See, e.g.*, *Auriga*, 40 A.3d at 881, 882 (awarding 50% of "reasonable attorneys' fees and costs" where behavior by defendant and his counsel "made this case unduly expensive for [plaintiffs] to pursue"); *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 124-25 (Del. Ch. 1999) (Strine, V.C.) (awarding plaintiff "half of [its] total fees and expenses left after [defendant] pays fully for the costs incurred by [plaintiff] in connection with: i) its successful motions to compel" and other specific costs occasioned by defendant's misconduct); *Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, 2013 WL 3934992, at *26-27 (Del. Ch. July 24, 2013) (awarding 80% of reasonable attorneys' fees and expenses where bad faith actions "reflect[ed] a flagrant disregard or inexcusable ignorance of a litigant's obligation to preserve its documents, including its electronically stored information").

## III. CONCLUSION

For the foregoing reasons, Elting's motion for sanctions is granted. Elting is directed to prepare and file with the Court within ten business days an implementing order stating the amount of the reasonable attorneys' fees and expenses she incurred during the periods described above, along with an affidavit documenting the same. The implementing order shall provide for the sanction to be paid within ten business days of entry of that order.