**Thomas T.S. KAUNG, Plaintiff–Below, Appellant,**

v.

**COLE NATIONAL CORPORATION, A Delaware Corporation Defendant–Below, Appellee.**

**No. 480, 2004.**

Supreme Court of Delaware.

Submitted March 30, 2005.

Decided July 5, 2005.

---

**20.** *Id.*

John L. Reed (argued), Thomas P. McGonigle, Matt Neiderman, of Duane Morris, L.L.P., New Castle, DE, for appellant.

Donald J. Wolf, Jr., Arthur L. Dent, Joseph B. Cicero, of Potter, Anderson & Carroon, L.L.P. and Robert P. Duvin, Robert M. Wolff (argued), Barry Y. Freeman, of Duvin, Cahn & Hutton, Cleveland, OH, for appellee.

Before STEELE, Chief Justice, HOLLAND and RIDGELY, Justices.

RIDGELY, Justice:

This appeal challenges rulings of the Court of Chancery made in the context of an advancement proceeding for litigation expenses. The case was brought by the plaintiff-appellant, Thomas T.S. Kaung ("Kaung"), as a corporate officer under 8 *Del. C.* § 145 ("Section 145"), against the defendant-appellee, Cole National Corporation ("Cole"). The Court of Chancery ruled that Kaung was not entitled to receive advancement of any part of his attorneys' fees and expenses related to time spent with a non-lawyer consultant. The Court of Chancery next ruled that Cole was entitled to recoup sums previously advanced with respect to the non-lawyer consultant's fees and attorneys' fees related to time spent with the non-lawyer consultant. The Court of Chancery finally awarded Cole its attorneys' fees and expenses, together with court costs, incurred in connection with this case. Kaung appeals the latter two rulings.

We find no abuse of discretion by the Court of Chancery in its award to Cole of fees and other legal expenses related to this action. We reverse, however, the recoupment award because it is beyond the scope of a summary proceeding for interim advancement of litigation expenses under Section 145.

## I. FACTUAL BACKGROUND

Kaung was employed by Cole on two separate occasions.[1] Kaung began his career with Cole in 1979 as a Corporate Controller and he ultimately rose to the positions of Executive Vice President and Chief Administrative Officer. In 1990, Kaung and Cole parted ways. In the interim, Kaung pursued other opportunities, including starting his own financial consulting firm called River International, Inc. ("River"), which provided consulting services in the area of financial controls. In fact, Cole was one of River's clients.

---

1. Cole is a publicly traded company incorporated in Delaware with its principal place of business in Ohio. Cole is primarily engaged in the optical industry. Its business includes retail stores operating under the names "Things Remembered," Sears Optical, Target Optical, Pearle Vision and BJ's Optical. Cole also operates a managed vision care provider called Cole Managed Vision.

During this relationship, River assisted Cole in restoring its financial viability and searching for high level management to fill the positions of Chief Operating Officer ("COO") and Chief Financial Officer ("CFO"). While Cole was successful in filling the COO position, it struggled to find a new CFO. Cole's Chief Executive Officer ("CEO"), Jeffrey Cole, then approached Kaung about taking the CFO position. Kaung was reluctant at first, because he was preparing to retire, but Jeffrey Cole ultimately persuaded Kaung to sign a three-year contract with Cole as its CFO. The parties had an understanding that during that period, Jeffrey Cole and Kaung would work towards turning around the company financially, while at the same time actively recruiting Kaung's replacement.

At the time Kaung became CFO, Cole insured Kaung and others with a Directors and Officers ("D & O") insurance policy. Kaung also entered into an indemnification agreement with Cole. This agreement provided that if Kaung was the subject of litigation related to his employment, Cole would advance Kaung reasonable litigation costs to the extent that the D & O policy was insufficient. Section 2(a) of the agreement provides that the company shall indemnify the Indemnitee "against any and all costs, charges and expenses (including, without limitation, attorneys' and others' fees and expenses), judgments, fines and amounts paid in settlement actually or reasonably incurred...."[2] Pursuant to Section 2(e) of the agreement, attorneys' and others' fees and expenses "shall be paid by the Company in advance of the final disposition of such action, suit or proceeding as authorized in accordance with Section 4(b)

hereof."[3] Section 4(b), in relevant part, states:

> For purposes of determining whether to authorize advancement of expenses pursuant to Section 2(e) hereof, the Indemnitee shall submit to the Board a sworn statement of request for advancement of expenses ... averring that (i) the Indemnitee has reasonably incurred or will reasonably incur actual expenses in defending an actual, civil, criminal, administrative or investigative action, suit, proceeding or claim and (ii) the Indemnitee undertakes to repay such amount if it shall ultimately be determined that the Indemnitee is not entitled to be indemnified by the Company, under this Agreement or otherwise.[4]

Kaung returned to Cole as CFO in March 2000, and as agreed, Jeffrey Cole hired Kaung's replacement, Larry Hyatt, in 2002. Following a short transition period, Kaung retired in July 2002. In the fall of 2002, however, questions arose regarding Cole's accounting practices. Those questions specifically addressed the revenues Cole recorded in its financials received from warranties sold on its optical products. Cole's former auditor, Arthur Andersen LLP, had maintained that recognizing warranty revenues at the time of sale was appropriate. Following the Enron and WorldCom scandals that implicated Arthur Anderson, Cole hired Deloitte & Touche LLP, which advised that the warranty revenue methodology that Arthur Anderson advocated was inappropriate. As a result, Cole publicly announced that it would restate its financials for fiscal years 1998 through 2001 as well as the first two quarters of 2002.

**2.** *Kaung v. Cole Nat'l. Corp.*, 2004 WL 1921249, at *4, 2004 Del. Ch. Lexis 126, at *17–*18.

**3.** *Id.* at *4, 2004 Del. Ch. Lexis 126, at *18.

**4.** *Id.*

In response to Cole's announcement, certain shareholders of Cole filed a class action suit on December 6, 2002. That suit, which contained allegations of securities fraud against Cole and its various corporate officers, included Kaung as a defendant. In addition, on December 24, 2002, the Securities and Exchange Commission (the "SEC") launched an investigation into Cole's accounting and financial reporting for the period during which Kaung was the CFO.

Cole then retained the Jones Day law firm to represent the corporate and individual defendants. Cole also hired the law firm of Venable LLP to perform an internal investigation. A determination was later made, however, that certain indemnitees, including Kaung, should seek separate representation. The Cole board of directors passed a resolution approving the separate representation.

Kaung hired Malcolm Kelso ("Kelso"), the sole member of the Irontree Group, Inc., as a non-lawyer consultant.[5] Kelso then introduced Kaung to Steven D. Cundra, Esquire ("Cundra"), of the O'Rourke & Cundra law firm, with whom Kelso had a prior relationship.[6] Kaung later retained the O'Rourke & Cundra law firm as his separate counsel in connection with the SEC investigation and the class action suit. The Court of Chancery inferred that

Kelso recommended these lawyers and urged Kaung to hire them, as evidenced by the fact that Kelso engaged in profitable joint representation with this firm in the past.[7] This inference is supported by the record.

Initially, Cole advanced all of Kelso's and Cundra's bills.[8] However, Cole then began to question the advancement of Kaung's legal expenses, specifically inquiring into Kelso's qualifications and his role in the litigation. On May 2, 2003, counsel for Cole sent a letter to O'Rourke & Cundra concerning the advancement of their bills and inquiring about Kelso's qualifications. In addition, on May 9, 2003, Cole's general counsel, Leslie D. Dunn, Esquire ("Dunn"), wrote to Kaung directly, expressing concern about the reasonableness of Kelso's fees.

Dunn testified that despite these repeated requests she never received information regarding Kelso's education or professional background, the scope of his work at Cole, the number of hours he worked on this matter or even his billing rate. Kaung claimed that he responded to Dunn's reservations about Kelso by pointing out that Kelso provided litigation consulting services to both Cole and Jones Day in the past. Kaung also emphasized that AIG, the D & O insurance carrier, had

---

5. Kaung testified that he and Kelso have known each other for over twenty years, and that they have worked on unrelated matters involving Cole in the past. In fact, Kelso is the ex-brother-in-law of Jeffrey Cole, the company's former CEO. Kelso has a very colorful background, including being serially sanctioned, found liable for civil theft in securities fraud and incarcerated for contempt of court. One judge has described Kelso as using "litigation to harass opponents and disrupt the judicial process." *Legal Econometrics, Inc. v. Abramson*, 1997 WL 786249, at *2 n. 2, 1997 U.S. Dist. Lexis 20354, at *5 (N.D.Tex.) (citation omitted).

6. The parties disputed the extent of Kelso's prior relationship with the O'Rourke & Cundra law firm, but the record is clear that the two have worked together on prior occasions. *Kaung*, 2004 WL 1921249, at *2 n. 5, 2004 Del. Ch. Lexis 126, at *6 n. 5.

7. *Id.* at *2, 2004 Del. Ch. Lexis 126, at *5.

8. The Cole board of directors authorized advancement of Kaung's legal expenses on January 23 and 24, 2003, and again, on March 27, 2003.

reviewed and approved payment for Kelso's work.

Cole advanced approximately $150,000 with respect to Kelso's bills for time spent through May 15, 2003. Cole also advanced all of O'Rourke & Cundra's fees through January 2004. In December 2003, out of the concern that the fees requested by Kaung were becoming excessive, Cole hired the law firm of Duvin, Cahn & Hutton to evaluate all advancement requests from Kaung related to the SEC investigation.

On January 7, 2004, Kaung sent Cole a notice of default for its failure to pay the balance of Kelso's bills for the period of mid-May until August 2003 and the November and December 2003 bills of O'Rourke & Cundra. Cole responded to Kaung on January 12, 2004, advising him that it was investigating the reasonableness of his litigation expenses, emphasizing that the shareholders' class action suit had concluded.[9] The same day, Kaung filed suit in the Court of Chancery to compel Cole to advance Kelso's and Cundra's fees for the SEC investigation and related class action litigation. The next day Cole authorized full payment of O'Rourke & Cundra's outstanding bills, but again notified Kaung that it had retained special outside counsel to review the reasonableness of all the bills. Despite the fact that Cole paid O'Rourke & Cundra's outstanding bills and continued to advance its fees, Kaung persisted in prosecuting this case in the Court of Chancery.

The course of discovery in this case was marked by conflict. The most egregious conduct came from Kelso. The Court of Chancery found that there were "emails from Kelso to Dunn and outside counsel to Cole that are at best bizarre and at worst threatening ... [and] Kelso's behavior in connection with his own deposition was highly inappropriate in that he repeatedly postponed his appearance and then refused to answer questions when he finally appeared."[10] In addition, Cundra's conduct during discovery was suspicious in that he did not respond to any of Cole's interrogatories or requests for production of documents regarding Kelso.[11]

The Court of Chancery held a one day trial on June 18, 2004. At a pretrial conference, Kaung's new Delaware counsel withdrew Kaung's request for payment of Kelso's fees. The Court of Chancery, therefore, only considered Kelso's role as a litigation advisor for the purpose of evaluating O'Rourke & Cundra's fees related to consultations with Kelso. It determined that the time billed by O'Rourke & Cundra relating to its dealing with Kelso was not reasonably incurred in connection with its representation of Kaung pursuant to the indemnification agreement.[12] As a result, the Court of Chancery concluded that O'Rourke & Cundra was not entitled to advancement of its unpaid legal fees.[13] The Court of Chancery also held that Cole would be entitled to offset any additional amount of those disallowed time charges against any future request by Kaung for advancement, and that at the conclusion of the SEC matter Cole would be entitled to sue Kaung for recovery of amounts it has already advanced that it believes were not properly subject to a claim for indemnifica-

9. The shareholders class action suit was settled in May 2003. However, the SEC investigation was ongoing.

10. *Id.* at *2 n. 10, 2004 Del. Lexis 126 at *8 n. 10.

11. *Id.*

12. *Kaung,* 2004 WL 1921249, at *5–*6, 2004 Del. Ch. Lexis 126, at *26–*27.

13. *Id.* at *6, 2004 Del. Ch. Lexis 126, at *27.

tion.[14]

In its final order and judgment following its written opinion, the Court of Chancery ordered Kaung to pay Cole $150,606.85 for the amount already advanced for Kelso's fees. It also determined that $81,760 of O'Rourke & Cundra's bill related to its interactions with Kelso and that Cole had no obligation to pay Kaung the $65,226.86 billed for the time that O'Rourke & Cundra spent consulting with Kelso. Kaung was ordered to pay Cole $16,533.14 as the portion of O'Rourke & Cundra's fees that had already been advanced pertaining to its dealings with Kelso. Kaung was also ordered to pay Cole $300,000 for attorneys' fees and expenses due to the bad faith conduct of his representatives in this action.

## II. THE COURT OF CHANCERY'S FEE SHIFTING AWARD

 We first address whether the Court of Chancery improperly shifted the costs of this advancement action to Kaung by awarding Cole its attorneys' fees and expenses, together with court costs, incurred in connection with this advancement action. At issue is whether the misconduct in this case satisfies the bad faith standard required for fee shifting. The Court of Chancery's discretion is broad in fixing the amount of attorneys' fees to be awarded.[15] Absent a clear abuse of discretion, we will not reverse the Court of Chancery's award.[16] After carefully reviewing the record, we find no abuse of discretion with respect to the Court of Chancery's fee shifting award.

 It is a general rule that courts in the United States do not award attorney's fees to prevailing parties in litigation.[17] This practice, commonly referred to as the "American Rule,"[18] is followed by the Delaware courts.[19] However, there are recognized exceptions to the American Rule, which invoke equitable principles that have been recognized as a matter of common law.[20] One well-recognized exception to the American Rule is where the "losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"[21] The purpose of this so-called "bad faith" exception is to "'deter abusive litigation in the future, thereby avoiding harassment and protecting the integrity of the judicial process.'"[22] Delaware courts have awarded attorney's fees for bad faith when "parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[23] In the present case, the record fully supports the Court of Chancery's conclusion that Kaung's "actions in the course of this litigation constitute bad faith conduct sufficient to justify an award of attorneys' fees."[24]

14. *Id.*

15. *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 547 (Del.1998).

16. *Id.* (citing *Chavin v. Cope*, 243 A.2d 694 (Del.1968)).

17. *Id.* at 545.

18. *Id.*

19. *Brice v. State*, 704 A.2d 1176, 1178 (Del. 1998).

20. *Id.* (citing *Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d 1039, 1043–44 (Del.1996)).

21. *Id.* at 1179 (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)).

22. *Id.* (quoting *Schlank v. Williams*, 572 A.2d 101, 108 (D.C.1990)).

23. *Johnston*, 720 A.2d at 546 (footnotes and citations omitted).

24. *Kaung*, 2004 WL 1921249, at *6, 2004 Del. Ch. Lexis 126, at *28.

At the time the suit was filed, Cole had already advanced more than $150,000 with respect to Kelso's fees and was withholding further payment after Kaung failed to provide further information regarding the reasonableness of Kelso's bills. Cole was not delinquent in paying O'Rourke & Cundra's bills and actually authorized the payment of them the day after Kaung filed suit. The record suggests that the decision to file suit was made in the hope of Cole advancing sums that were not reasonably incurred in connection with the representation of Kaung.[25]

In addition, the record shows that throughout the litigation Kaung's representatives made excessive and duplicative deposition requests while ignoring their own discovery obligations. They refused to facilitate the schedule of Kelso's deposition, and when he finally appeared for deposition, he refused to answer questions and instead peppered Cole's attorneys with questions and accusations. Cundra, who accompanied Kelso to the deposition, aggravated the situation by supporting Kelso's behavior and failing to provide any substantive answers to Cole's discovery requests regarding Kelso.

We therefore have no difficulty in upholding the Court of Chancery's conclusion that the conduct of Kaung's representatives in this case rose to the level of bad faith. Thus, the Court of Chancery did not abuse its discretion in awarding Cole its attorneys' fees and expenses incurred in connection with this advancement action.

We take this opportunity to comment further on the unseemly conduct of Kelso and Cundra. We do so under our "exclusive supervisory responsibility to regulate and enforce appropriate conduct of ... all lawyers, litigants, witnesses, and others" participating in a Delaware proceeding.[26]

For the past several years, professionalism and legal ethics has been the subject of much discussion among judges, practitioners, scholars and the general public.[27] One component of this dialogue concerns professional responsibility in the discovery practice, which implicates the "basic and fundamental" concept of civility,[28] the flip side of the coin being incivility.[29] Civility plays an important role in the administration of civil and criminal justice. Without it, litigation becomes even more expensive and public trust and confidence in the administration of justice is undermined. Alexander Hamilton put it best that "the ordinary administration of criminal and civil justice ... contributes ... more than any other circumstance, to impressing upon the minds of the people affection, esteem, and reverence toward the government."[30] Litigation tainted with incivility

**25.** An email from Kelso to Cundra strongly suggests an improper motive. The email reads as follows: "This looks good to me—file suit as soon as possible—they will pay—DUNN is a fool." *See* Transcript of Trial Proceeding on June 18, 2004 at Defense Exhibit 77.

**26.** *Paramount Communications, Inc. v. QVC Network, Inc.,* 637 A.2d 34, 52 n. 23 (Del. 1994) (citations omitted).

**27.** *See generally* Paula L. Hannaford, *The National Action Plan on Lawyer Conduct: A Role for the Judge in Improving Professionalism in the Legal System,* 36 Ct. Rev. 36 (1999) (addressing he increasing role of the judicial system in improving attorney professionalism).

**28.** *Kohlmayer v. Nat'l R.R. Passenger Corp.,* 124 F.Supp.2d 877, 879 (D.N.J.2000).

**29.** *See* Douglas R. Richmond, *The Ethics of Zealous Advocacy: Civility Candor and Parlor Tricks,* 34 Tex. Tech. L. Rev. 3, 7 (2002).

**30.** The Federalist No. 78, at 103 (Alexander Hamilton) (1st Modern Library ed., 1941).

and its resulting expense has the opposite effect. Justice Sandra Day O'Connor has commented:

> I believe that the justice system cannot function effectively when the professionals charged with administering it cannot even be polite to one another. Stress and frustration drive down productivity and make the process more time-consuming and expensive. Many of the best people get driven away from the field. The profession and the system itself lose esteem in the public's eyes.
>
> \* \* \* \* \* \*
>
> In my view, incivility disserves the client because it wastes time and energy—time that is billed to the client at hundreds of dollars an hour, and energy that is better spent working on the case than working over the opponent.[31]

We could not agree more with Justice O'Connor's insightful comments.

In *Paramount,* this Court addressed in an addendum to its opinion the "issue of professionalism involving deposition practice in proceedings in Delaware trial courts."[32] The focus of the addendum in *Paramount* was a lawyer, who represented a Paramount director in his deposition in an unprofessional way.[33] The lawyer did not otherwise appear for a party in this case and was not admitted *pro hac vice.*[34] During the deposition, he instructed the Paramount director not to answer questions, "was extraordinarily rude, uncivil and vulgar," obstructed the deposing lawyer from eliciting testimony from the Paramount director, and disparaged the deposing lawyer with personal insults.

■ This Court found that lawyer's "unprofessional behavior to be outrageous and unacceptable."[35] It is just as outrageous and unacceptable when accomplished by a non-lawyer consultant or a witness at a deposition. We join the Court of Chancery in its strong disapproval of it. For future guidance and deterrence, we emphasize that sanctions may be imposed upon anyone participating in a Delaware proceeding who engages in abusive litigation tactics.[36]

## III. THE COURT OF CHANCERY'S RECOUPMENT AWARD

■ We now turn to whether the Court of Chancery erred, as a matter of law, by determining Kaung's liability to Cole for fees previously advanced in this summary proceeding. We review the Court of Chancery's factual findings for clear error.[37] Once the Court of Chancery's factual findings are established, we will review the ultimate determination of the legal issue presented under a *de novo* standard of review.[38]

---

31. *Paramount,* 637 A.2d at 52 n. 24 (quoting Justice Sandra Day O'Connor, Remarks to an American Bar Association Group on "Civil Justice Improvements" (Dec. 14, 1993)).

32. *Id.* at 52.

33. *Id.*

34. *Id.*

35. *Paramount,* 637 A.2d at 54–55.

36. *See Link v. Wabash R.R.,* 370 U.S. 626, 631–32, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)

(providing that courts have inherent power to levy sanctions in response to abusive litigation tactics); *Roadway Express v. Piper,* 447 U.S. 752, 764–67, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (recognizing that courts have inherent power to assess attorney's fees against counsel for abusive litigation practices); *In re Miller,* 81 B.R. 669, 676 (Bankr.M.D.Fla.1988) (noting that all courts have inherent civil contempt power).

37. *Scharf v. Edgcomb Corp.,* 864 A.2d 909, 916 (Del.2004) (citing *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

■ Section 145 of the DGCL vests Delaware corporations with the capacity to protect their present and former corporate officials from expenses incurred in connection with litigation and other legal proceedings.[39] Rights to indemnification and advancement are deeply rooted in the public policy of Delaware corporate law in that they are viewed less as an individual benefit arising from a person's employment and more as a desirable mechanism to manage risk in return for greater corporate benefits.[40] Section 145 of the DGCL expressly contemplates protection for corporate officials from the risks of legal proceedings not only by way of reimbursement (i.e., indemnification) but also by the pre-indemnification advancement of certain litigation-related expenses.[41]

■ An advancement action is a summary proceeding.[42] The statutory authorization for interim advancement of litigation expenses is distinct from the right to receive final indemnification under Section 145(a) and (b) of the DGCL.[43] Whether a corporate officer has a right to indemnification is a decision that must necessarily await the outcome of the investigation or litigation.[44] Section 145(e) of the DGCL fills the gap by permitting advancement, so the corporation may shoulder these interim costs.[45] However, the scope of an advancement proceeding under Section 145(k) of the DGCL is limited to determining "the issue of entitlement according to the corporation's advancement provisions and not to issues regarding the movant's alleged conduct in the underlying litigation."[46]

■ We recognize, as the Court of Chancery has, that the right to advancement "is a subsidiary element of the right to ultimate indemnification"[47] and these legally distinct rights "are commonly addressed in neighboring statutory provisions."[48] However, the narrow scope of an advancement proceeding prohibits an ultimate determination of indemnification and liability owed by a corporate official for sums already advanced.[49] While the

---

38. *Id.* (citing *Pullman–Standard, Div. of Pullman, Inc. v. Swint,* 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *Lopez v. State,* 861 A.2d 1245 (Del.2004)).

39. *See* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 8–2.

40. *Id.*

41. *Id.*

42. *Homestore, Inc. v. Tafeen,* 2005 WL 1383348, at *1, 2005 Del. Lexis 217, at *2; *Fasciana v. Elec. Data Sys. Corp.,* 829 A.2d 160, 167 (Del.Ch.2003).

43. *See Advanced Mining Sys., Inc. v. Fricke,* 623 A.2d 82, 84 (Del.Ch.1992) (finding that "indemnification rights and rights to advancement of possibly indemnifiable expenses ... [are] distinct types of legal rights."); *Cita-*

*del Holding Corp. v. Roven,* 603 A.2d 818 (Del.1992) (holding that the right to advancement of expenses was not dependent on the right to indemnification).

44. *See* Wolfe & Pittenger, *supra* note 39, at § 8–2.

45. *Id.*

46. *Homestore,* 2005 WL 1383348, at *1, 2005 Del. Lexis 217, at *2.

47. *Weinstock v. Lazard Debt Recovery GP, LLC,* 2003 WL 21843254, at *4, 2003 Del. Ch. Lexis 83, at *12–*13.

48. *Nakahara v. NS 1991 Am. Trust,* 739 A.2d 770, 779 n. 52 (Del.Ch.1998).

49. *See, e.g., Reddy v. Elec. Data Sys. Corp.,* 2002 Del. Ch. Lexis 69, at *29 ("Section 145 of the DGCL is an explicit rejection of this approach, because the clear authorization of

rights to indemnification and advancement are correlative, they are still discrete and independent rights, with the latter having a much narrower scope.[50]

In the present case, it was appropriate for the Court of Chancery to determine that the time billed by O'Rourke & Cundra relating to its dealings with Kelso was not reasonably incurred in connection with its representation of Kaung pursuant to the indemnification agreement, and that O'Rourke & Cundra was not entitled to advancement of its unpaid legal fees. However, we conclude that the Court of Chancery prematurely decided Kaung's liability for sums previously advanced voluntarily by Cole. The Court of Chancery's determination was premature, just as a direct recoupment claim would have been by Cole for fees it advanced. We hold that an advancement proceeding is summary in nature and not appropriate for litigating indemnification or recoupment. The detailed analysis required of such claims is both premature and inconsistent with the purpose of a summary proceeding.[51]

## IV. CONCLUSION

We affirm the Court of Chancery's award of attorneys' fees and expenses in favor of Cole. We reverse as premature the judgment of the Court of Chancery to the extent it ordered Kaung to repay sums already advanced.

---

advancement rights presupposes that the corporation will front expenses before any determination is made of the corporate official's ultimate right to indemnification,") (citing *Greco v. Columbia/HCA Healthcare Corp.*, 1999 WL 1261446, at *4, 1999 Del. Ch. Lexis 24, at *12; *Ridder v. CityFed Fin. Corp.*, 47 F.3d 85, 87 (3d Cir.1995)).

50. *See* Wolfe & Pittenger, *supra* note 39, at § 8–2.

51. *See Bergonzi v. Rite Aid Corp.*, 2003 WL 22407303, at *3–*4, 2003 Del. Ch. Lexis 117, at *11–*12 (holding that the corporation could not assert as a defense to a claim for advancement or as a ground for recouping amounts previously advanced that the former CFO had not satisfied statutory standards of conduct for indemnification, notwithstanding a guilty plea by the former CFO in a criminal proceeding for which advances were sought, and that it would be premature to decide whether the former CFO was entitled to indemnification because he had not been sentenced and therefore the criminal proceeding had not reached final judgment). *Cf. Rales v. Blasband*, 634 A.2d 927, 931 n. 4 (Del.1993) (indicating that a statutory books and records action is a summary proceeding); *Khanna v. Covad Comm'n Group, Inc.*, 2004 WL 187274, at *6, 2004 Del. Ch. Lexis 11, at *22 (providing that a statutory books and records action is not the proper forum for litigating a breach of fiduciary duty case because the detailed analysis required for a fiduciary duty action would defeat the purpose of that summary proceeding).