NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 21-3207, 21-3292
_____

KNOWLEDGELAKE, INC.,
A Delaware Corporation, Appellant/Cross-Appellee

v.

PFU AMERICA GROUP MANAGEMENT, INC.,
A California Corporation
_____

Appeal from the United States District Court
for the District of Delaware
(D.C. Civ. Action No. 1-20-CV-00425)
District Judge: Hon. Mark A. Kearney*
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
January 24, 2023
_____

Before: GREENAWAY, JR., BIBAS, and FUENTES, *Circuit Judges*.

(Opinion Filed:  April 13, 2023)

---

* Sitting by designation from the United States District Court for the Eastern District of Pennsylvania.

_____

OPINION[*]

_____

GREENAWAY, JR., *Circuit Judge*.

This suit arises from Plaintiff-Appellant/Cross-Appellee KnowledgeLake, Inc.'s business transaction with Defendant-Appellee/Cross-Appellant, PFU America Group Management, Inc. (now known as PFU America, Inc.) (PFU). After a bench trial, the United States District Court for the District of Delaware entered judgment for PFU and declined to award attorneys' fees to either party. We will affirm the District Court's judgment.

## I. FACTS AND PROCEDURAL HISTORY

At its core, this dispute has to do with whether a buyer intimately aware of a company's business operations should reap a benefit when the seller of the enterprise surprisingly fully complied with the terms of the agreement. The District Court conducted a bench trial after which it thoroughly documented the facts and relevant law.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

We commend the District Court on its detailed findings of fact and conclusions of law, and only summarize the facts here for the Parties.

In 1999, Ron Cameron (Cameron) founded KnowledgeLake, Inc. (Old KL), a software company that interpreted and sorted electronic documents into separate files. Cameron was the Chief Executive Officer (CEO) of Old KL from 2001 to 2016. In 2016, after Cameron exited from the Old KL venture, Bernie Schweiss became President and CEO.

In May 2013, PFU bought Cameron's interest in Old KL. From then until March 30, 2018, PFU owned 100% of the shares of Old KL, making PFU the parent company. In 2017, about one year after Cameron's departure, PFU sought to sell Old KL back to Cameron, who had started another company by the same name: KnowledgeLake (New KL, the current Appellant/Cross-Appellee). This sale of Old KL back to Cameron became plausible once Cameron informed then Executive Vice President of PFU, Kenjiro Tsurumi, that the sale posed "zero risk for PFU." S.A.257. At that point, the Parties agreed that the purchase price would be $10.7 million and that PFU would leave $3 million behind in cash with the new company after closing. PFU agreed to this only if

an invoice by Walmart Inc. (Walmart), as described below, was paid before the closing date.

PFU and New KL entered into a Stock Purchase Agreement (SPA)[1] on March 23, 2018. The Closing took place on March 30, 2018. There was another key term during negotiations; this is what anchors this entire litigation. PFU and New KL agreed that any invoices collected before March 31, 2018 belonged to PFU as the parent company of Old KL and that any invoices paid after March 31, 2018 would belong to New KL as the purchaser.[2] This contingency had to do with Old KL's largest customer, Walmart. Old KL had a standard procedure to contact customers for unpaid invoices. Old KL would follow up with a customer two weeks after an invoice had been generated to ensure that the invoice had been received and that the customer had no questions. If, within thirty

---

[1] The relevant provisions of the SPA are the following: Article 3.1 of the SPA described certain representations and warranties that PFU made to New KL/Cameron. This provision broadly governs the organization of PFU, what authorization PFU has in the period from signing to closing, and the transfer of ownership of company shares. Article 3.2(i)(ix)(b) represented that Old KL had not conducted an "acceleration in the collection of any accounts or notes receivable or otherwise change on any of its cash management policies . . . other than in the ordinary course of business" from December 31, 2017 onwards. App. 76. Article 4.1 required that PFU/Old KL keep its present employees and agents and "conduct its business in the ordinary course," to maintain all relationships with entities such as suppliers and governmental organizations. App. 84. The same provision prevented PFU/Old KL from accelerating collections of any accounts receivable or changing any of its cash management policies.

[2] From reviewing the SPA, it is unclear if this was incorporated as a formal term. The Parties refer to it as if it was a key condition during negotiations but this term itself is not reflected in the SPA. Nevertheless, it is evident that the Parties intended to abide by it as a condition of leaving $3 million with the company for Cameron to receive as the buyer.

days, Old KL did not receive a payment, it would follow up and then start a collection process involving phone calls and emails to the customer.

Customarily, Old KL's accounting team produced and collected invoices and the processing of accounts payable. At times, the professional services team and even members of the executive team were involved in collecting overdue payments on invoices. For example, the executive team (including the President and CEO at the time) would review past-due invoices to understand why an invoice was not paid at the appropriate time outlined. The President and CEO focused on the customers who had the largest invoices and managed the macro-level finances to determine fiscal year end accountability. The President may have reached out to the account manager or any other person responsible for the relationship with the customer to collect payment for these invoices.

This process became relevant in early 2018. Old KL sent an invoice to Walmart dated February 15, 2018, for the amount of $1,008,043.22. The invoice had a due date of "[n]et 30 days," S.A.259, meaning that it was due on March 17, 2018. Walmart failed to pay the invoice by this date, which precipitated a series of actions by Old KL personnel to ensure Walmart would make good on its past due payment.

At first, Old KL did not contact Walmart. In March, after this payment was due, Robin Heisler, Old KL's Chief Financial Officer, became aware that Walmart had many invoices that were past due. Internally, Schweiss reached out to Dot Vigil, an Old KL accountant, and asked about the February Walmart invoice. Vigil notified Schweiss that

5

Old KL had not received payment from Walmart. Schweiss contacted Gary Wahlig, the account manager for Walmart, on March 21, 2018. Wahlig informed that he needed to check in with the Walmart Help Desk and Schweiss reiterated the importance of having this invoice paid before the PFU fiscal year ended.

Once it became clear that the bill would remain unpaid, Old KL communicated with Walmart regarding the past due invoice. Schweiss himself did not communicate with anyone at Walmart about this invoice even at this juncture. Instead, a professional services department member, Marsha Moffett, worked with Wahlig and Vigil in coordinating contact with Walmart. Vigil acknowledged to Moffett that the payment for this invoice was critical for the fiscal year end. Wahlig notified both Moffett and Vigil that Walmart would not be paying this February invoice because of an error resulting in duplicate payments.

Walmart's failure to pay the February 2018 invoice triggered a change in the terms of the SPA, namely how much money would be left with Old KL such that New KL could receive it once the sale closed. On March 21, 2018, Tsurumi notified Cameron that Old KL did not receive the invoice payment from Walmart. Tsurumi relayed that the term to leave $3 million cash with Old KL upon closing depended on receipt of payment from Walmart and if the payment was not received, PFU would need a credit of the invoice amount (about $1 million) from the $3 million left in cash. Tsurumi proposed a change to the SPA, which Cameron declined. Cameron later communicated to Tsurumi a concern about Schweiss accelerating collection of receivables, as barred by the SPA

6

because it was not in the ordinary course of business as it would ultimately result in less funds left with Old KL once it was sold to Cameron. Tsurumi replied that the Walmart invoice was already past due and there was no intention to expedite payments for clients where the payments were not yet due.

On March 22, 2018, Tsurumi made a revised offer for the sale of Old KL that Cameron accepted. This offer created a contingency if Old KL did not have sufficient funds to cover the month-end and restructuring costs that were agreed to. It included that PFU would leave $2.5 million in cash in Old KL at closing and all receivables, including the $1 million invoice from Walmart, collected on or before March 31, 2018 would belong to PFU and all payments collected after March 31, 2018 would belong to New KL. The purchase price decreased to $10.2 million.

The Parties signed this new SPA, the one in front of us, on March 23, 2018. Cameron agreed to the above proposal by Tsurumi because he believed that any payments made to Old KL by Walmart were the result of Old KL acting outside the ordinary course of business and that meant that Cameron could sue PFU to collect the payment. Cameron "played hardball" and made a "bet on his business strategy," in assuming that he would come out on top regardless of what occurred. App. 21. Cameron failed to account for Walmart's actions.

On March 26, Walmart paid Old KL a portion of the February 15, 2018 invoice. The total amount of the payment was $978,518.22, of which $872,743 went toward the February 15, 2018 invoice. The remaining amount of the February 15 invoice was paid

after March 31, 2018.  The money paid by Walmart before March 31, 2018 went to PFU and the portion paid after went to New KL.  Cameron knew that Walmart paid the February 2018 invoice on March 26 and still proceeded to close on the purchase of Old KL.  The sale closed on March 30, 2018.

Once the deal closed, New KL sued PFU. The District Court conducted a one-day bench trial on two breach of contract issues (Articles 4.1 and 3.1[3] of the SPA) and one count of intentional misrepresentation.  The District Court concluded that PFU did not breach Article 4.1 of the SPA because there was no contract at the time of the conduct by Old KL personnel who contacted Walmart about its past due invoice.  Similarly, the District Court found that New KL did not plead a breach of contract claim under Article 3.1 of the SPA.

Even if it did, PFU did not breach this provision because it did not act outside the ordinary course of business.  The District Court also held that PFU did not make intentional misrepresentations because PFU acted within the ordinary course of business.

---

[3] The District Court proceeded to analyze this issue on the merits in its opinion even though this issue was not raised until post-trial. The breach of contract issue under Article 3.1 was not litigated on the merits at trial, as discussed throughout.

Lastly, the District Court declined to award attorneys' fees to either party. This timely appeal followed, both on the merits and on the issue of attorneys' fees.

## II.     JURISDICTION

The District Court had jurisdiction over this matter under 28 U.S.C. § 1332(a). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## III.    STANDARD OF REVIEW

This Court reviews a district court's findings of fact for clear error and its conclusions of law de novo. *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 282–83 (3d Cir. 2014) (citing *McCutcheon v. Am.'s Servicing Co.*, 560 F.3d 143, 147 (3d Cir. 2009)). We review mixed questions of law and fact under the clearly erroneous standard. *Id.* at 283 (citation omitted). Findings of fact are clearly erroneous when they are "devoid of minimum evidentiary support displaying some hue of credibility or bear[ing] no rational relationship to the supportive evidentiary data." *Berg Chilling Sys., Inc. v. Hull Corp.*, 369 F.3d 745, 754 (3d Cir. 2004) (quoting *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 353 (3d Cir. 2002)).

A district court's interpretation of legal principles is subject to plenary review under this standard. *VICI Racing, LLC*, 763 F.3d at 283. When a district court's rulings are based on credibility determinations, our review is especially deferential because the trial judge is aware of characteristics that bear on the understanding of what is said by a witness. *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 156–57 (3d Cir. 2010) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)).

Contract interpretation, which involves figuring out the meaning of contractual terms and effectuating the parties' intent, is reviewed for clear error. *In re Nat'l Collegiate Student Loan Trs.*, 971 F.3d 433, 443 (3d Cir. 2020) (citation omitted). Conversely, contract construction requires a court to go beyond mere interpretation. *Id.* It requires "determining the legal effect and consequences of contractual provisions." *Id.* (citations omitted). A court engages in contract construction when the contract is affected by events after the finalization of a contract that is not foreseen by the parties. *Ram Constr. Co., Inc. v. Am. States Ins. Co.*, 749 F.2d 1049, 1053 (3d Cir. 1984) (citations omitted). Put differently, a court must determine the legal effect of an agreement that the parties did not foresee, and this requires construction. *Id.*

To adjudicate this dispute, we review the District Court's interpretation of the SPA, thus requiring us to review for clear error. At issue are material facts surrounding the actions of Old KL personnel in relation to obtaining the Walmart invoice and whether these actions violated various provisions in the SPA. Determining this requires an interpretation of relevant contractual provisions rather than determining whether a second agreement was created. *See Ram Constr. Co.*, 749 F.2d at 1052–53 (finding trial court engaged in contract construction because the court had to evaluate how parties' actions affected the first contract and whether a second contract was created). Further, we are required to apply the phrase "ordinary course of business," as articulated in the SPA, to facts that the parties foresaw, supporting the finding that the trial court engaged in contract interpretation. *See STV Eng'rs, Inc. v. Greiner Eng'g, Inc.*, 861 F.2d 784, 788

10

(3d Cir. 1988) (holding that the court had to construct the contract because the court had to apply contractual terms to events unforeseen by the parties). Cameron knew this litigation was not only possible but probable as a result of the exact scenario presented to both the District Court and this Court.

A trial court's decision to award attorneys' fees is reviewed for abuse of discretion. *Silberman v. Bogle*, 683 F.2d 62, 65 (3d Cir. 1982); *Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 506 (Del. 2005) (no reversal of attorneys' fees award "[a]bsent a clear abuse of discretion").

## IV. ANALYSIS

New KL appeals the District Court's judgment in favor of PFU. New KL argues that the SPA governed pre-signing conduct and therefore PFU breached multiple provisions by acting outside the ordinary course of business and made intentional misrepresentations for the Closing to occur. PFU cross-appeals the District Court's denial of attorneys' fees and argues that New KL began and continued to litigate in bad faith. We will affirm the District Court's judgment with respect to both issues.

### A. No SPA Prior to March 23, 2018[4]

At issue is whether a contract existed prior to the signing of the SPA on March 23, 2018. Neither party disputes that the SPA is governed by Delaware contract law. These

---

[4] Appellee's sandbagging arguments are irrelevant to the disposition of this issue. New KL argues that the District Court's finding that no contract existed is clearly erroneous because it conflicts with Delaware law. Sandbagging as a term refers to "the practice of asserting a claim based on a representation despite having had reason to

11

principles dictate that a contract's meaning "should be that which would be understood by an objective, reasonable third party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (cleaned up). A contract should be interpreted in accordance with the parties' intentions as reflected within the "four corners of the agreement" such that all provisions remain in effect. *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (cleaned up). The contract must be read such that the provisions at issue are evaluated based on the entire contract. *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 913–14 (Del. 2017). A specific meaning discerned from a provision cannot dictate the meaning of the contract if the specific meaning conflicts with the agreement's overall plan. *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

The District Court did not clearly err in determining that PFU could not have breached the SPA because no contract existed prior to the signing on March 23, 2018. Article 4.1 is the relevant provision of the SPA here. It is titled "Interim Operations" and begins with the phrase "[s]eller shall cause. . . ." App. 84. Cameron signed the SPA on behalf of New KL on March 23, 2018. All the actions that New KL alleges undergird its breach of contract claim occurred before March 23, 2018. Schweiss contacted Wahlig

---

suspect it was inaccurate." *Akorn, Inc. v. Fresenius Kabi AG*, No. 2018-0300-JTL, 2018 WL 4719347, at \*77 n.756 (Del. Ch. Oct. 1, 2018) (discussing commentary on Delaware as a pro-sandbagging state). The District Court did not base its ruling on the fact that New KL and Cameron knew of Old KL's efforts to obtain the past due Walmart invoice. Rather, it determined that PFU could not have breached an agreement that did not exist and that PFU did not act outside the ordinary course of business.

about the February 15, 2018 Walmart invoice on March 21, 2018.  Wahlig, with no direction from Schweiss, contacted Walmart about the already past due invoice on the same date.  Even the communication between Tsurumi and Cameron related to this conduct took place on March 21, 2018 and March 22, 2018.  Therefore, we agree with the District Court that PFU could not have breached Article 4.1 of the SPA because the contract did not exist at the time PFU engaged in the conduct that New KL objected to in its Complaint.

The reading of another provision supports the conclusion that the SPA does not govern conduct prior to March 23, 2018.   Reading Article 4.1 in the way we describe above does not render Article 3.2(i)(ix)(b) or Article 4.2(a) meaningless.  Appellee ignores key language from Article 3.2, which governs sub provision (i).  It describes that "PFU hereby represents and warrants to [New KL/Cameron] that *as of the date hereof and as of the Closing,*" and then the provision goes on to describe different representations PFU is making in selling Old KL to Cameron.  App. 72 (emphasis added).  It is correct that Article 3.2(i) specifically denotes that Old KL ought not to have engaged in any acceleration of accounts from December 31, 2017 to March 23, 2018.

But the same provision creates an exception with the following clarifying clause: "other than in the ordinary course of business." App. 76.

        B.      Ordinary Course of Business under Article 3.2(i)(ix)(b) of the SPA[5]

PFU did not act outside the ordinary course of business when it reached out to Walmart about its February 2018 past due invoice. Under Article 3.2(i)(ix)(b) required that PFU represented and warranted that it would not conduct an "acceleration in the collection of any accounts or notes receivable or otherwise change on any of its cash management policies . . . *other than in the ordinary course of business*" from December 31, 2017 and onwards. App. 76 (emphasis added).

"[O]rdinary course of business" means practices undertaken "in the regular course of events" during "normal routine in managing a trade of business." *Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, Nos. 3158-VCL & 3406-VCL, 2009 WL 1111179, at *8 (Del. Ch. Apr. 27, 2009) (recounting Black's Law Dictionary definition of "ordinary" and "course of business"). This means actions taken in "the customary and normal routine of managing a business in the expected manner" are appropriate even where such restrictive covenants are at play. *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, No. 2020-0310-JTL, 2020 WL 7024929, at *68 (Del. Ch. Nov. 30,

---

[5] The District Court mistakenly said that in post-trial briefing, New KL pressed a new breach theory based on Article 3.1. But New KL's arguments were about only Articles 3.2 and 4.1. So, we need not consider New KL's assertions on appeal that the District Court wrongly failed to analyze an Article 3.1 breach claim. And any error was harmless, because the District Court considered New KL's ordinary-course arguments under both Articles 3.1 and 3.2.

14

2020).  This covenant ensures that a buyer of a company is paying for the same asset at closing as understood at the signing.  *Id.* (quoting *Akorn, Inc. v. Fresenius Kabi AG*, No. 2018-0300-JTL, 2018 WL 4719347 at \*83 (Del. Ch. Oct. 1, 2018)).  The business and its practices must remain materially the same from the signing of a contract to the closing of the deal.  *Id.*

There are two sources of evidence a court can examine to discern what is within the ordinary course of business in a situation.  First, "the court can look to how the company has operated in the past, both generally and under similar circumstances."  *Id.* at \*70.  Second, one must look toward how comparable companies are operating or have operated in general and similar circumstances, though this has become less relevant.  *Id.* The compliance is measured by the company's own operational history.  *AB Stable VIII LLC v. MAPS Hotel & Resorts Once LLC*, 268 A.3d 198, 212 (Del. 2021).  Because New KL's evidence at trial and arguments before us focus on Old KL and PFU's business practices, we focus our discussion on those.

New KL has not shown clear error in the District Court's finding that PFU did not act outside the ordinary course of business.  On appeal, New KL re-asserts the same arguments it did at trial as to why PFU acted outside the ordinary course of business when Schweiss and Wahlig sought to receive payment from Walmart.

These arguments fail.  PFU did nothing extraordinary to collect the past due Walmart invoice.  The invoice was already past due before the SPA was signed.  Also, PFU, Old KL, Schweiss, or Wahlig did not pre-emptively accelerate the invoice before

15

the 30-day period expired. As a result, it was within the ordinary course of business for Schweiss to engage with other employees about an invoice that had become past due. It is logical that Schweiss would reach out to Wahlig about the invoice because Wahlig was the point of contact for Walmart. On appeal, New KL ignores that Wahlig did not engage in any actions (calling the Walmart helpdesk, emailing Walmart's distribution list, contacting Walmart's vendor management office, and accessing Walmart's private portal) at Schweiss's or PFU's behest.

This followed Old KL's ordinary practice that non-accounting team members may be engaged once an invoice became past due, particularly if it was a large customer or an otherwise important invoice to the company. Any acceleration of the Walmart invoice was unlike the immense business changes that courts have held to be outside the ordinary course of business such that a buyer's belief is altered on what company he or she is purchasing. *Compare Snow Phipps Grp., LLC v. KCAKE Acquisition, Inc.*, No. 2020-0282-KSJM, 2021 WL 1714202, at \*37–40 (Del. Ch. Apr. 30, 2021) (holding that a draw of $15 million, the largest in company's history, and decreasing labor costs in line with decreased production was within the ordinary course of business), *with AB Stable*, 2020 WL 7024929, at \*75–79 (finding material breach of ordinary-course-of-business covenant where hotel company closed two hotels and limited operations of the remaining

16

thirteen hotels, decreased employee headcount, and minimized spending as a result of COVID-19 pandemic).

There is nothing out of the ordinary course of business about the timing of Walmart's payment. Appellant argues that PFU caused Old KL to act outside its ordinary course of business because Walmart paid its February 2018 invoice earlier than it usually would. Walmart's decision to pay the invoice on March 26, 2018 before the deal was closed is not at issue. The District Court correctly noted that Walmart consistently paid its yearly software maintenance fees as a part of its invoice before Old KL's fiscal year ended in March. This is the same thing that occurred here.

New KL does not offer sufficient evidence for us to disturb the District Court's finding that PFU did not cause Old KL to, and Old KL did not, act outside the ordinary course of business. *See FleetBoston Fin. Corp. v. Advanta Corp.*, No. Civ.A-16912-NC, 2003 WL 240885, at \*27 (Del. Ch. Jan. 22, 2003) (evidence presented was "too thin" to show that Appellee acted outside the ordinary course of business). Similarly, we cannot revisit the District Court's credibility determinations as the basis of its ruling because we give "due regard to the trial court's opportunity to judge the witnesses' credibility." *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 514–15 (3d Cir. 2012) (quoting Fed. R. Civ. P. 52(a)(6)). Appellant ignores that the District Court specifically credited Schweiss's testimony over Cameron's in reaching its conclusions, and in asking us to revisit this case Appellant essentially asks us to revisit these credibility determinations. The District Court observed that Cameron "played hardball" and made a "bet on his business

17

strategy" and eventually lost. App. 21. What Cameron could not control for was Walmart's actions. He cannot now force the law to "bend to [his desires]." App. 21.

### C.    Intentional Misrepresentation

PFU did not make any intentional misrepresentations in the SPA because PFU acted within the ordinary course of business, as discussed *supra*, Part IV(C). A party must prove these five elements to succeed on an intentional misrepresentation claim:

> (1) Deliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak; (2) that the defendant acted with scienter; (3) an intent to induce plaintiff's reliance upon concealment; (4) causation; and (5) damages resulting from the concealment.

*Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987). No action for intentional misrepresentation can succeed, under the facts presented here, because the first element of scienter is not met. There may be instances elsewhere when an action for intentional misrepresentation may succeed even when a party is acting within ordinary course of business. As discussed, PFU did not cause Old KL to act outside the scope of ordinary business when it asked Walmart to pay its overdue invoice before the end of Old KL's fiscal year. So, it did not deliberately conceal anything.

### D.    Attorneys' Fees

PFU is not entitled to attorneys' fees for this litigation. PFU cross-appeals the District Court's denial of attorney's fees and argues that New KL conducted this litigation in bad faith. While New KL, through Cameron, made a corporate bet and

18

engaged in a shrewd business tactic, this litigation is not in bad faith. We will affirm the District Court's denial of attorneys' fees.

Generally, United States courts do not award attorney's fees to prevailing parties. *Kaung*, 884 A.2d at 506. There is an exception to this that has been recognized in common law. *Id.* A prevailing party may be entitled to attorneys' fees where the "losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Id.* (quoting *Brice v. State*, 704 A.2d 1176, 1779 (Del. 1998)). Bad faith exists where a party has "unnecessarily prolonged or delayed litigation, falsified records[,] or knowingly asserted frivolous claims." *Id.* (internal quotation marks omitted). A court may look at pre-litigation conduct to determine whether one sued in bad faith. *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 546 (Del. 1998). This deters abusive behavior in litigation and protects the integrity of the judicial process. *Kaung*, 884 A.2d at 506.

Both of PFU's arguments about bad faith lack merit. PFU raises two arguments: (1) that New KL brought this suit in bad faith in the first instance and (2) New KL prolonged the litigation with baseless motion-practice, showing bad faith. Much of PFU's argument is anchored in the premise that there is bad faith because Cameron knew he would sue if New KL lost the funds from the Walmart invoice. This premise is incorrect. Cameron believed he could sue, and he did so because he plausibly believed that any payment from Walmart would necessarily stem from conduct outside of the ordinary course of business on the part of Old KL and PFU. For example, Cameron told

19

Tsurumi that the loss of the invoice was a problem for the deal and that any acceleration of Walmart payments went against the terms of the SPA.

There is no evidence in the record to show that Cameron initiated the lawsuit in bad faith. All the evidence in the record shows that Cameron acted as a calculating businessperson who wagered that Walmart would not pay its invoice before March 31, 2018, entitling any future funds to New KL. This belief did not exist because his claims were obviously incorrect, as PFU suggests, but it existed because he truly thought he could win any future lawsuit on the merits. Cameron's personal knowledge about PFU's orientation as risk-averse was not used to pressure PFU into a settlement but to halt any extraordinary activity Old KL was considering at the time. Similarly, Cameron used this leverage to position himself as the main buyer of Old KL by relaying to PFU that there would be minimal risk of overall litigation compared to if PFU sold Old KL to another entity. This conduct does not rise to the level of bad faith that courts have found sufficient to award attorneys' fees where litigation is used to yield a favorable settlement. *See ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member, LLC*, No. 5843-VCL, 2013 WL 5152295, at *15 (Del. Ch. Sept. 16, 2013) (finding bad faith where a plaintiff sued in three jurisdictions in an effort to intimidate the defendant despite knowing the main allegations were false).

No evidence proves that New KL prolonged this litigation in bad faith, either. For such a finding to be made, PFU would need to show that one has engaged in "glaringly egregious conduct" as opposed to having taken an "aggressive litigation position." *In re*

20

*Dissolution of Jeffco Mgmt., LLC*, No. 2018-0027-PAF, 2021 WL 3611788, at \*16 (Del. Ch. Aug. 16, 2021) (describing that there is a "fine line" between the two).  A finding of frivolousness may contribute to a showing of bad faith.  *Id.* at \*15.  The District Court made no such finding here.  New KL's tactic of bringing a motion for sanctions as against the norms of the professional bar is within the realms of an "aggressive litigation position" and standing alone is not enough to show bad faith.

While there is some concern for New KL's conduct during this litigation—as evidenced by the District Court's reminder of all attorneys' professional obligations—there is insufficient evidence for us to conclude that the actions here rise to the level of bad faith warranting the award of attorneys' fees.  *See e.g.*, *Kaung*, 884 A.2d at 507 (finding bad faith where a plaintiff had an improper motive for suing, plaintiff's attorneys made duplicative discovery requests, and one witness refused to answer any questions during a deposition); *Johnston*, 720 A.2d at 546 (finding bad faith where defendants defended an action despite no defense, delayed by filing frivolous motions, falsified evidence, and changed their testimony); *Montgomery Cellular Holding Co., Inc. v. Dobler*, 880 A.2d 206, 228–29 (Del. 2005) (finding bad faith where a party obstructed and prevented a fair valuation of an entity because there was false testimony and information requested by the lower court was destroyed to prevent gaining access to it).

## V.     CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment in favor of PFU and affirm the denial of attorneys' fees.

21